# YOUNG, MAYOR OF DETROIT, ET AL. *v.* AMERI-CAN MINI THEATRES, INC., ET AL.

No. 75–312.   Argued March 24, 1976—Decided June 24, 1976

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL (except for Part III), and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 73. STEWART, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 84. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, *post*, p. 88.

*Maureen Pulte Reilly* argued the cause for petitioners. With her on the brief were *Kermit G. Bailer* and *John E. Cross.*

*John H. Weston* argued the cause for respondents American Mini Theatres, Inc., et al. With him on the brief were *David M. Brown, Stanley Fleishman,* and *Sam Rosenwein. Stephen M. Taylor* argued the cause for respondent Nortown Theatre, Inc. With him on the brief was *Robert Eugene Smith.*

MR. JUSTICE STEVENS delivered the opinion of the Court.*

Zoning ordinances adopted by the city of Detroit differentiate between motion picture theaters which exhibit sexually explicit "adult" movies and those which do not. The principal question presented by this case is whether that statutory classification is unconstitutional because it is based on the content of communication protected by the First Amendment.[1]

Effective November 2, 1972, Detroit adopted the ordinances challenged in this litigation. Instead of concentrating "adult" theaters in limited zones, these ordinances require that such theaters be dispersed. Specifically, an adult theater may not be located within 1,000 feet of any two other "regulated uses" or within 500 feet of a residential area.[2] The term "regulated uses" includes 10 different kinds of establishments in addition to adult theaters.[3]

---

*Part III of this opinion is joined by only THE CHIEF JUSTICE, MR. JUSTICE WHITE, and MR. JUSTICE REHNQUIST.

[1] "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." This Amendment is made applicable to the States by the Due Process Clause of the Fourteenth Amendment. *Edwards* v. *South Carolina,* 372 U. S. 229.

[2] The District Court held that the original form of the 500-foot restriction was invalid because it was measured from "any building containing a residential, dwelling or rooming unit." The city did not appeal from that ruling, but adopted an amendment prohibiting the operation of an adult theater within 500 feet of any area zoned for residential use. The amended restriction is not directly challenged in this litigation.

[3] In addition to adult motion picture theaters and "mini" theaters, which contain less than 50 seats, the regulated uses include adult bookstores; cabarets (group "D"); establishments for the sale of beer or intoxicating liquor for consumption on the premises; hotels or motels; pawnshops; pool or billiard halls; public lodging houses; secondhand stores; shoeshine parlors; and taxi dance halls.

The classification of a theater as "adult" is expressly predicated on the character of the motion pictures which it exhibits. If the theater is used to present "material distinguished or characterized by an emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas,' " [4] it is an adult establishment. [5]

[4] These terms are defined as follows:

"For the purpose of this Section, 'Specified Sexual Activities' is defined as:

"1. Human Genitals in a state of sexual stimulation or arousal;

"2. Acts of human masturbation, sexual intercourse or sodomy;

"3. Fondling or other erotic touching of human genitals, pubic region, buttock or female breast.

"And 'Specified Anatomical Areas' is defined as:

"1. Less than completely and opaquely covered: (a) human genitals, pubic region, (b) buttock, and (c) female breast below a point immediately above the top of the areola; and

"2. Human male genitals in a discernibly turgid state, even if completely and opaquely covered."

[5] There are three types of adult establishments—bookstores, motion picture theaters, and mini motion picture theaters—defined respectively as follows:

"Adult Book Store

"An establishment having as a substantial or significant portion of its stock in trade, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas,' (as defined below), or an establishment with a segment or section devoted to the sale or display of such material.

"Adult Motion Picture Theater

"An enclosed building with a capacity of 50 or more persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas,' (as defined below) for observation by patrons therein.

"Adult Mini Motion Picture Theater

"An enclosed building with a capacity for less than 50 persons used for presenting material distinguished or characterized by an

The 1972 ordinances were amendments to an "Anti-Skid Row Ordinance" which had been adopted 10 years earlier. At that time the Detroit Common Council made a finding that some uses of property are especially injurious to a neighborhood when they are concentrated in limited areas.[6] The decision to add adult motion picture theaters and adult book stores to the list of businesses which, apart from a special waiver,[7] could not be located within 1,000 feet of two other "regulated uses," was, in part, a response to the significant growth in the number

emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas,' (as defined below), for observation by patrons therein."

[6] Section 66.000 of the Official Zoning Ordinance (1972) recited:

"In the development and execution of this Ordinance, it is recognized that there are some uses which, because of their very nature, are recognized as having serious objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances thereby having a deleterious effect upon the adjacent areas. Special regulation of these uses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood. These special regulations are itemized in this section. The primary control or regulation is for the purpose of preventing a concentration of these uses in any one area (i. e. not more than two such uses within one thousand feet of each other which would create such adverse effects)."

[7] The ordinance authorizes the Zoning Commission to waive the 1,000-foot restriction if it finds:

"a) That the proposed use will not be contrary to the public interest or injurious to nearby properties, and that the spirit and intent of this Ordinance will be observed,

"b) That the proposed use will not enlarge or encourage the development of a 'skid row' area.

"c) That the establishment of an additional regulated use in the area will not be contrary to any program of neigh[bor]hood conservation nor will it interfere with any program of urban renewal.

"d) That all applicable regulations of this Ordinance will be observed."

of such establishments.[8] In the opinion of urban planners and real estate experts who supported the ordinances, the location of several such businesses in the same neighborhood tends to attract an undesirable quantity and quality of transients, adversely affects property values, causes an increase in crime, especially prostitution, and encourages residents and businesses to move elsewhere.

Respondents are the operators of two adult motion picture theaters. One, the Nortown, was an established theater which began to exhibit adult films in March 1973. The other, the Pussy Cat, was a corner gas station which was converted into a "mini theater," but denied a certificate of occupancy because of its plan to exhibit adult films. Both theaters were located within 1,000 feet of two other regulated uses and the Pussy Cat was less than 500 feet from a residential area. The respondents brought two separate actions against appropriate city officials, seeking a declaratory judgment that the ordinances were unconstitutional and an injunction against their enforcement. Federal jurisdiction was properly invoked[9] and the two cases were consolidated for decision.[10]

The District Court granted defendants' motion for summary judgment. On the basis of the reasons stated

---

[8] A police department memorandum addressed to the assistant corporation counsel stated that since 1967 there had been an increase in the number of adult theaters in Detroit from 2 to 25, and a comparable increase in the number of adult book stores and other "adult-type businesses."

[9] Respondents alleged a claim for relief under 42 U. S. C. § 1983, invoking the jurisdiction of the federal court under 28 U. S. C. § 1343 (3).

[10] Both cases were decided in a single opinion filed jointly by Judge Kennedy and Judge Gubow. *Nortown Theatre* v. *Gribbs,* 373 F. Supp. 363 (ED Mich. 1974).

by the city for adopting the ordinances, the court concluded that they represented a rational attempt to preserve the city's neighborhoods.[11] The court analyzed and rejected respondents' argument that the definition and waiver provisions in the ordinances were impermissibly vague; it held that the disparate treatment of adult theaters and other theaters was justified by a compelling state interest and therefore did not violate the Equal Protection Clause;[12] and finally it concluded that the regulation of the places where adult films could be shown did not violate the First Amendment.[13]

---

[11] "When, as here, the City has stated a reason for adopting an ordinance which is a subject of legitimate concern, that statement of purpose is not subject to attack.

"Nor may the Court substitute its judgment for that of the Common Council of the City of Detroit as to the methods adopted to deal with the City's legitimate concern to preserve neighborhoods, so long as there is some rational relationship between the objective of the Ordinance and the methods adopted." *Id.*, at 367.

[12] "Because the Ordinances distinguish adult theatres and bookstores from ordinary theatres and bookstores on the basis of the content of their respective wares, the classification is one which restrains conduct protected by the First Amendment. See Interstate Circuit, Inc. v. Dallas, 390 U. S. 676 . . . (1968). The appropriate standard for reviewing the classification, therefore, is a test of close scrutiny. Harper v. Virginia Board of Elections, 383 U. S. 663, 670 . . . (1966); NAACP v. Button, 371 U. S. 415, 438 . . . (1963). Under this test, the validity of the classification depends on whether it is necessary to further a compelling State interest.

"The compelling State interest which the Defendants point to as justifying the restrictions on locations of adult theatres and bookstores is the preservation of neighborhoods, upon which adult establishments have been found to have a destructive impact. The affidavit of Dr. Mel Ravitz clearly establishes that the prohibition of more than one regulated use within 1000 feet is necessary to promote that interest. This provision therefore does not offend the equal protection clause." *Id.*, at 369.

[13] "Applying those standards to the instant case, the power to license and zone businesses and prohibit their location in certain

The Court of Appeals reversed. *American Mini Theatres, Inc.* v. *Gribbs,* 518 F. 2d 1014 (CA6 1975). The majority opinion concluded that the ordinances imposed a prior restraint on constitutionally protected communication and therefore "merely establishing that they were designed to serve a compelling public interest" provided an insufficient justification for a classification of motion picture theaters on the basis of the content of the materials they purvey to the public.[14] Relying primarily on *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, the court held the ordinance invalid under the Equal Protection Clause. Judge Celebrezze, in dissent, ex-

---

areas is clearly within the constitutional power of the City. The government interest, i. e. the preservation and stabilization of neighborhoods in the City of Detroit, is unrelated to the suppression of free expression. First Amendment rights are indirectly related, but only in the sense that they cannot be freely exercised in specific locations. Plaintiffs would not contend that they are entitled to operate a theatre or bookstore, which are commercial businesses, in a residentially zoned area; nor could they claim the right to put on a performance for profit in a public street. Admittedly the regulation here is more restrictive, but it is of the same character." *Id.,* at 371.

[14] "The City did not discharge its heavy burden of justifying the prior restraint which these ordinances undoubtedly impose by merely establishing that they were designed to serve a compelling public interest. Since fundamental rights are involved, the City had the further burden of showing that the method which it chose to deal with the problem at hand was necessary and that its effect on protected rights was only incidental. The City could legally regulate movie theatres and bookstores under its police powers by providing that such establishments be operated only in particular areas. . . . However, this ordinance selects for special treatment particular business enterprises which fall within the general business classifications permissible under zoning laws and classifies them as regulated uses solely by reference to the content of the constitutionally protected materials which they purvey to the public." 518 F. 2d, at 1019–1020.

pressed the opinion that the ordinance was a valid " 'time, place and manner' regulation," rather than a regulation of speech on the basis of its content.[15]

Because of the importance of the decision, we granted certiorari, 423 U. S. 911.

As they did in the District Court, respondents contend (1) that the ordinances are so vague that they violate the Due Process Clause of the Fourteenth Amendment; (2) that they are invalid under the First Amendment as prior restraints on protected communication; and (3) that the classification of theaters on the basis of the content of their exhibitions violates the Equal Protection Clause of the Fourteenth Amendment. We consider their arguments in that order.

I

There are two parts to respondents' claim that the ordinances are too vague. They do not attack the specificity of the definition of "Specified Sexual Activities" or "Specified Anatomical Areas." They argue, however, that they cannot determine how much of the described activity may be permissible before the exhibition is "characterized by an emphasis" on such matter. In addition, they argue that the ordinances are vague because they do not specify adequate procedures or standards for obtaining a waiver of the 1,000-foot restriction.

We find it unnecessary to consider the validity of either of these arguments in the abstract. For even if there may be some uncertainty about the effect of the

---

[15] He stated in part:

"I do not view the 1000-foot provision as a regulation of speech on the basis of its content. Rather, it is a regulation of the right to locate a business based on the side-effects of its location. The interest in preserving neighborhoods is not a subterfuge for censorship." *Id.,* at 1023.

ordinances on other litigants, they are unquestionably applicable to these respondents. The record indicates that both theaters propose to offer adult fare on a regular basis.[16] Neither respondent has alleged any basis for claiming or anticipating any waiver of the restriction as applied to its theater. It is clear, therefore, that any element of vagueness in these ordinances has not affected these respondents. To the extent that their challenge is predicated on inadequate notice resulting in a denial of procedural due process under the Fourteenth Amendment, it must be rejected. Cf. *Parker* v. *Levy,* 417 U. S. 733, 754–757.

Because the ordinances affect communication protected by the First Amendment, respondents argue that they may raise the vagueness issue even though there is no uncertainty about the impact of the ordinances on their own rights. On several occasions we have determined that a defendant whose own speech was unprotected had standing to challenge the constitutionality of a statute which purported to prohibit protected speech, or even speech arguably protected.[17] This ex-

---

[16] Both complaints allege that only adults are admitted to these theaters. Nortown expressly alleges that it "desires to continue exhibiting adult-type motion picture films at said theater." Neither respondent has indicated any plan to exhibit pictures even arguably outside the coverage of the ordinances.

[17] "Such claims of facial overbreadth have been entertained in cases involving statutes which, by their terms, seek to regulate 'only spoken words.' *Gooding* v. *Wilson,* 405 U. S. 518, 520 (1972). See *Cohen* v. *California,* 403 U. S. 15 (1971); *Street* v. *New York,* 394 U. S. 576 (1969); *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes. Over-

ception from traditional rules of standing to raise constitutional issues has reflected the Court's judgment that the very existence of some statutes may cause persons not before the Court to refrain from engaging in constitutionally protected speech or expression. See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 611–614. The exception is justified by the overriding importance of maintaining a free and open market for the interchange of ideas. Nevertheless, if the statute's deterrent effect on legitimate expression is not "both real and substantial," and if the statute is "readily subject to a narrowing construction by the state courts," see *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 216, the litigant is not permitted to assert the rights of third parties.

We are not persuaded that the Detroit zoning ordinances will have a significant deterrent effect on the exhibition of films protected by the First Amendment.

---

breadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations. See *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *United States* v. *Robel,* 389 U. S. 258 (1967); *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964); *Shelton* v. *Tucker,* [364 U. S. 479 (1960)]. Facial overbreadth claims have also been entertained where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct, see *Grayned* v. *City of Rockford, supra,* at 114–121; *Cameron* v. *Johnson,* 390 U. S., at 617–619; *Zwickler* v. *Koota,* 389 U. S. 241, 249–250 (1967); *Thornhill* v. *Alabama,* 310 U. S. 88 (1940), and where such conduct has required official approval under laws that delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights. See *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969); *Cox* v. *Louisiana,* 379 U. S. 536, 553–558 (1965); *Kunz* v. *New York,* 340 U. S. 290 (1951); *Lovell* v. *Griffin,* 303 U. S. 444 (1938)." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612–613.

As already noted, the only vagueness in the ordinances relates to the amount of sexually explicit activity that may be portrayed before the material can be said to be "characterized by an emphasis" on such matter. For most films the question will be readily answerable; to the extent that an area of doubt exists, we see no reason why the ordinances are not "readily subject to a narrowing construction by the state courts." Since there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance, and since the limited amount of uncertainty in the ordinances is easily susceptible of a narrowing construction, we think this is an inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court.

The only area of protected communication that may be deterred by these ordinances comprises films containing material falling within the specific definitions of "Specified Sexual Activities" or "Specified Anatomical Areas." The fact that the First Amendment protects some, though not necessarily all, of that material from total suppression does not warrant the further conclusion that an exhibitor's doubts as to whether a borderline film may be shown in his theater, as well as in theaters licensed for adult presentations, involves the kind of threat to the free market in ideas and expression that justifies the exceptional approach to constitutional adjudication recognized in cases like *Dombrowski* v. *Pfister*, 380 U. S. 479.

The application of the ordinances to respondents is plain; even if there is some area of uncertainty about their application in other situations, we agree with the District Court that respondents' due process argument must be rejected.

## II

Petitioners acknowledge that the ordinances prohibit theaters which are not licensed as "adult motion picture theaters" from exhibiting films which are protected by the First Amendment. Respondents argue that the ordinances are therefore invalid as prior restraints on free speech.

The ordinances are not challenged on the ground that they impose a limit on the total number of adult theaters which may operate in the city of Detroit. There is no claim that distributors or exhibitors of adult films are denied access to the market or, conversely, that the viewing public is unable to satisfy its appetite for sexually explicit fare. Viewed as an entity, the market for this commodity is essentially unrestrained.

It is true, however, that adult films may only be exhibited commercially in licensed theaters. But that is also true of all motion pictures. The city's general zoning laws require all motion picture theaters to satisfy certain locational as well as other requirements; we have no doubt that the municipality may control the location of theaters as well as the location of other commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city. The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances.

Putting to one side for the moment the fact that adult motion picture theaters must satisfy a locational restriction not applicable to other theaters, we are also persuaded that the 1,000-foot restriction does not, in itself, create an impermissible restraint on protected communication. The city's interest in planning and regulating the use of property for commercial purposes

is clearly adequate to support that kind of restriction applicable to all theaters within the city limits. In short, apart from the fact that the ordinances treat adult theaters differently from other theaters and the fact that the classification is predicated on the content of material shown in the respective theaters, the regulation of the place where such films may be exhibited does not offend the First Amendment.[18] We turn, therefore, to the question whether the classification is consistent with the Equal Protection Clause.

### III

A remark attributed to Voltaire characterizes our zealous adherence to the principle that the government may not tell the citizen what he may or may not say. Referring to a suggestion that the violent overthrow of tyranny might be legitimate, he said: "I disapprove of what you say, but I will defend to the death your right to say it."[19] The essence of that comment has been repeated time after time in our decisions invalidating attempts by the government to impose selective controls upon the dissemination of ideas.

Thus, the use of streets and parks for the free expression of views on national affairs may not be conditioned upon the sovereign's agreement with what a speaker may intend to say.[20] Nor may speech be curtailed because it

---

[18] Reasonable regulations of the time, place, and manner of protected speech, where those regulations are necessary to further significant governmental interests, are permitted by the First Amendment. See, *e. g.*, *Kovacs* v. *Cooper*, 336 U. S. 77 (limitation on use of sound trucks); *Cox* v. *Louisiana*, 379 U. S. 559 (ban on demonstrations in or near a courthouse with the intent to obstruct justice); *Grayned* v. *City of Rockford*, 408 U. S. 104 (ban on willful making, on grounds adjacent to a school, of any noise which disturbs the good order of the school session).

[19] S. Tallentyre, The Friends of Voltaire 199 (1907).

[20] See *Hague* v. *CIO*, 307 U. S. 496, 516 (opinion of Roberts, J.).

invites dispute, creates dissatisfaction with conditions the way they are, or even stirs people to anger.[21]  The sovereign's agreement or disagreement with the content of what a speaker has to say may not affect the regulation of the time, place, or manner of presenting the speech.

If picketing in the vicinity of a school is to be allowed to express the point of view of labor, that means of expression in that place must be allowed for other points of view as well.  As we said in *Mosley:*

"The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter.  Peaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on a picket sign.  But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.  *Cohen* v. *California,* 403 U. S. 15, 24 (1971); *Street* v. *New York,* 394 U. S. 576 (1969); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269–270 (1964), and cases cited; *NAACP* v. *Button,* 371 U. S. 415, 445 (1963); *Wood* v. *Georgia,* 370 U. S. 375, 388–389 (1962); *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949); *De Jonge* v. *Oregon,* 299 U. S. 353, 365 (1937).  To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship.  The essence of this forbidden censorship is content control.  Any restriction on expressive activity because of its con-

---

[21] *Terminiello* v. *Chicago,* 337 U. S. 1, 4.

tent would completely undercut the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' *New York Times Co.* v. *Sullivan, supra,* at 270.

"Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." 408 U. S., at 95–96. (Footnote omitted.)

This statement, and others to the same effect, read literally and without regard for the facts of the case in which it was made, would absolutely preclude any regulation of expressive activity predicated in whole or in part on the content of the communication. But we learned long ago that broad statements of principle, no matter how correct in the context in which they are made, are sometimes qualified by contrary decisions before the absolute limit of the stated principle is reached.[22] When we review this Court's actual adjudications in the First Amendment area, we find this to have been the case

[22] See, *e. g., Kastigar* v. *United States,* 406 U. S. 441, 454–455; *United Gas Co.* v. *Continental Oil Co.,* 381 U. S. 392, 404.

with the stated principle that there may be no restriction whatever on expressive activity because of its content.

The question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech. Thus, the line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which the speech occurs, but also on exactly what the speaker had to say.[23] Similarly, it is the content of the utterance that determines whether it is a protected epithet or an unprotected "fighting comment."[24] And in time of war "the publication of the sailing dates of transports or the number and location of troops" may unquestionably be restrained, see *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 716, although publication of news stories with a different content would be protected.

Even within the area of protected speech, a difference in content may require a different governmental response. In *New York Times Co.* v. *Sullivan,* 376 U. S. 254, we recognized that the First Amendment places limitations on the States' power to enforce their libel laws. We held that a public official may not recover damages from a critic of his official conduct without proof of "malice" as specially defined in that opinion.[25] Implicit in the opinion is the assumption that if the content of the newspaper article had been different—that is, if its subject matter had not been a public official—a lesser standard of proof would have been adequate.

---

[23] See *Bond* v. *Floyd,* 385 U. S. 116, 133–134; *Harisiades* v. *Shaughnessy,* 342 U. S. 580, 592; *Musser* v. *Utah,* 333 U. S. 95, 99–101.

[24] In *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 574, we held that a statute punishing the use of "damned racketeer[s]" and "damned Facist[s]" did not unduly impair liberty of expression.

[25] "Actual malice" is shown by proof that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U. S., at 280.

In a series of later cases, in which separate individual views were frequently stated, the Court addressed the broad problem of when the *New York Times* standard of malice was required by the First Amendment. Despite a/ diversity of opinion on whether it was required only in cases involving public figures, or also in cases involving public issues, and on whether the character of the damages claim mattered, a common thread which ran through all the opinions was the assumption that the rule to be applied depended on the content of the communication.[26] But that assumption did not contradict the underlying reason for the rule which is generally described as a prohibition of regulation based on the content of protected communication. The essence of that rule is the need for absolute neutrality by the government; its regulation of communication may not be affected by sympathy or hostility for the point of view being expressed by the communicator.[27] Thus, although

---

[26] See, for example, the discussion of the " 'public or general interest' test" for determining the applicability of the *New York Times* standard in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 346, and the reference, *id.*, at 348, to a factual misstatement "whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." The mere fact that an alleged defamatory statement is false does not, of course, place it completely beyond the protection of the First Amendment. "The First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.*, at 341.

[27] Thus, Professor Kalven wrote in The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 29:

"[The Equal Protection Clause] is likely to provide a second line of defense for vigorous users of the public forum. If some groups are exempted from a prohibition on parades and pickets, the rationale for regulation is fatally impeached. The objection can then no longer be keyed to interferences with other uses of the public places, but would appear to implicate the kind of message that the groups were transmitting. The regulation would thus slip from the neu-

the content of a story must be examined to decide whether it involves a public figure or a public issue, the Court's application of the relevant rule may not depend on its favorable or unfavorable appraisal of that figure or that issue.

We have recently held that the First Amendment affords some protection to commercial speech.[28] We have also made it clear, however, that the content of a particular advertisement may determine the extent of its protection. A public rapid transit system may accept some advertisements and reject others.[29] A state statute may permit highway billboards to advertise businesses located in the neighborhood but not elsewhere,[30] and regulatory commissions may prohibit businessmen from making statements which, though literally true, are potentially deceptive.[31] The measure of constitutional pro-

---

trality of time, place, and circumstance into a concern about content. The result is that equal-protection analysis in the area of speech issues would merge with considerations of censorship. And this is precisely what Mr. Justice Black argued in *Cox:*

" 'But by specifically permitting picketing for the publication of labor union views, Louisiana is attempting to pick and choose among the views it is willing to have discussed on its streets. It is thus trying to prescribe by law what matters of public interest people it allows to assemble on its streets may and may not discuss. This seems to me to be censorship in a most odious form . . .' [379 U. S., at 581]."

[28] *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S. 748.

[29] *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (product advertising accepted, while political cards rejected).

[30] *Markham Advertising Co.* v. *State,* 73 Wash. 2d 405, 439 P. 2d 248 (1968), appeal dismissed for want of a substantial federal question, 393 U. S. 316.

[31] In *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 617, the Court upheld a federal statute which balanced an employer's free speech right to communicate with his employees against the employees' rights to associate freely by providing that the expres-

tection to be afforded commercial speech will surely be governed largely by the content of the communication.[32]

More directly in point are opinions dealing with the question whether the First Amendment prohibits the State and Federal Governments from wholly suppressing sexually oriented materials on the basis of their "obscene character." In *Ginsberg* v. *New York*, 390 U. S. 629, the Court upheld a conviction for selling to a minor magazines which were concededly not "obscene" if shown to adults. Indeed, the Members of the Court who would accord the greatest protection to such materials have repeatedly indicated that the State could prohibit the distribution or exhibition of such materials to juveniles and unconsenting adults.[33] Surely the First Amendment does

---

sion of " 'any views, argument, or opinion' " should not be " 'evidence of an unfair labor practice,' " *so long as* such expression contains " 'no threat of reprisal or force or promise of benefit' " which would involve interference, restraint, or coercion of employees in the exercise of their right to self-organization.

The power of the Federal Trade Commission to restrain misleading, as well as false, statements in labels and advertisements has long been recognized. See, *e. g.*, *Jacob Siegel Co.* v. *FTC*, 327 U. S. 608; *FTC* v. *National Comm'n on Egg Nutrition*, 517 F. 2d 485 (CA7 1975); *E. F. Drew & Co.* v. *FTC*, 235 F. 2d 735, 740 (CA2 1956).

[32] As MR. JUSTICE STEWART pointed out in *Virginia Pharmacy Board* v. *Virginia Consumer Council, supra,* at 779 (concurring opinion), the "differences between commercial price and product advertising . . . and ideological communication" permits regulation of the former that the First Amendment would not tolerate with respect to the latter.

[33] In *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 73, MR. JUSTICE BRENNAN, in a dissent joined by MR. JUSTICE STEWART and MR. JUSTICE MARSHALL, explained his approach to the difficult problem of obscenity under the First Amendment:

"I would hold, therefore, that at least in the absence of distribution to juveniles or obtrusive exposure to unconsenting adults, the First and Fourteenth Amendments prohibit the State and Federal

not foreclose such a prohibition; yet it is equally clear that any such prohibition must rest squarely on an appraisal of the content of material otherwise within a constitutionally protected area.

Such a line may be drawn on the basis of content without violating the government's paramount obligation of neutrality in its regulation of protected communication. For the regulation of the places where sexually explicit films may be exhibited is unaffected by whatever social, political, or philosophical message a film may be intended to communicate; whether a motion picture ridicules or characterizes one point of view or another, the effect of the ordinances is exactly the same.

Moreover, even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate that inspired Voltaire's immortal comment. Whether political oratory or philosophical discussion moves us to applaud or to despise what is said, every schoolchild can understand why our duty to defend the right to speak remains the same. But few of us would march our sons and daughters off to war to preserve the citizen's right to see "Specified Sexual Activities" exhibited in the theaters of our choice. Even though the First Amendment protects communication in this area from total suppression, we hold that the State may legitimately use the content of these materials as the basis

Governments from attempting wholly to suppress sexually oriented materials on the basis of their allegedly 'obscene' contents. Nothing in this approach precludes those governments from taking action to serve what may be strong and legitimate interests through regulation of the manner of distribution of sexually oriented material." *Id.*, at 113.

for placing them in a different classification from other motion pictures.

The remaining question is whether the line drawn by these ordinances is justified by the city's interest in preserving the character of its neighborhoods. On this question we agree with the views expressed by District Judges Kennedy and Gubow. The record discloses a factual basis for the Common Council's conclusion that this kind of restriction will have the desired effect.[34] It is not our function to appraise the wisdom of its decision to require adult theaters to be separated rather than concentrated in the same areas. In either event, the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect. Moreover, the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.

Since what is ultimately at stake is nothing more than a limitation on the place where adult films may be exhibited,[35] even though the determination of whether a

---

[34] The Common Council's determination was that a concentration of "adult" movie theaters causes the area to deteriorate and become a focus of crime, effects which are not attributable to theaters showing other types of films. It is this secondary effect which these zoning ordinances attempt to avoid, not the dissemination of "offensive" speech. In contrast, in *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, the justifications offered by the city rested primarily on the city's interest in protecting its citizens from exposure to unwanted, "offensive" speech. The only secondary effect relied on to support that ordinance was the impact on traffic—an effect which might be caused by a distracting open-air movie even if it did not exhibit nudity.

[35] The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech. Here, however, the District Court specifically found that "[t]he Ordinances do not affect the operation of existing establishments but only the location of new ones. There are myriad locations in

particular film fits that characterization turns on the nature of its content, we conclude that the city's interest in the present and future character of its neighborhoods adequately supports its classification of motion pictures. We hold that the zoning ordinances requiring that adult

---

the City of Detroit which must be over 1000 feet from existing regulated establishments. This burden on First Amendment rights is slight." 373 F. Supp., at 370.

It should also be noted that the definitions of "Specified Sexual Activities" and "Specified Anatomical Areas" in the zoning ordinances, which require an emphasis on such matter and primarily concern conduct, are much more limited than the terms of the public nuisance ordinance involved in *Erznoznik, supra,* which broadly prohibited scenes which could not be deemed inappropriate even for juveniles.

"The ordinance is not directed against sexually explicit nudity, nor is it otherwise limited. Rather, it sweepingly forbids display of all films containing *any* uncovered buttocks or breasts, irrespective of context or pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous. The ordinance also might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach. Clearly all nudity cannot be deemed obscene even as to minors. See *Ginsberg* v. *New York, supra.* Nor can such a broad restriction be justified by any other governmental interest pertaining to minors. Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." 422 U. S., at 213–214.

Moreover, unlike the ordinances in this case, the *Erznoznik* ordinance singled out movies "containing even the most fleeting and innocent glimpses of nudity . . . ." *Id.,* at 214.

The Court's opinion in *Erznoznik* presaged our holding today by noting that the presumption of statutory validity "has less force when a classification turns on the subject matter of expression." *Id.,* at 215. Respondents' position is that the presumption has no force, or more precisely, that any classification based on subject matter is absolutely prohibited.

motion picture theaters not be located within 1,000 feet of two other regulated uses does not violate the Equal Protection Clause of the Fourteenth Amendment.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL, concurring.

Although I agree with much of what is said in the Court's opinion, and concur in Parts I and II, my approach to the resolution of this case is sufficiently different to prompt me to write separately.[1] I view the case as presenting an example of innovative land-use regulation, implicating First Amendment concerns only incidentally and to a limited extent.

## I

One-half century ago this Court broadly sustained the power of local municipalities to utilize the then relatively novel concept of land-use regulation in order to meet effectively the increasing encroachments of urbanization upon the quality of life of their citizens. *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926). The Court there noted the very practical consideration underlying the necessity for such power: "[W]ith the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities." *Id.,* at 386–387. The Court also

---

[1] I do not think we need reach, nor am I inclined to agree with, the holding in Part III (and supporting discussion) that nonobscene, erotic materials may be treated differently under First Amendment principles from other forms of protected expression. I do not consider the conclusions in Part I of the opinion to depend on distinctions between protected speech.

laid out the general boundaries within which the zoning power may operate: Restrictions upon the free use of private land must find their justifications in "some aspect of the police power, asserted for the public welfare"; the legitimacy of any particular restriction must be judged with reference to all of the surrounding circumstances and conditions; and the legislative judgment is to control in cases in which the validity of a particular zoning regulation is "fairly debatable." *Id.*, at 387, 388.

In the intervening years zoning has become an accepted necessity in our increasingly urbanized society, and the types of zoning restrictions have taken on forms far more complex and innovative than the ordinance involved in *Euclid*. In *Village of Belle Terre* v. *Boraas*, 416 U. S. 1 (1974), we considered an unusual regulation enacted by a small Long Island community in an apparent effort to avoid some of the unpleasantness of urban living. It restricted land use within the village to single-family dwellings and defined "family" in such a way that no more than two unrelated persons could inhabit the same house. We upheld this ordinance, noting that desires to avoid congestion and noise from both people and vehicles were "legitimate guidelines in a land-use project addressed to family needs" and that it was quite within the village's power to "make the area a sanctuary for people." *Id.*, at 9.

## II

Against this background of precedent, it is clear beyond question that the Detroit Common Council had broad regulatory power to deal with the problem that prompted enactment of the Anti-Skid Row Ordinance. As the Court notes, *ante*, at 54, and n. 6, the Council was motivated by its perception that the "regulated uses," when concentrated, worked a "deleterious effect upon the

adjacent areas" and could "contribute to the blighting or downgrading of the surrounding neighborhood." The purpose of preventing the deterioration of commercial neighborhoods was certainly within the concept of the public welfare that defines the limits of the police power. See *Berman* v. *Parker,* 348 U. S. 26, 32–33 (1954). Respondents apparently concede the legitimacy of the ordinance as passed in 1962, but challenge the amendments 10 years later that brought within its provisions adult theaters as well as adult bookstores and "topless" cabarets. Those amendments resulted directly from the Common Council's determination that the recent proliferation of these establishments and their tendency to cluster in certain parts of the city would have the adverse effect upon the surrounding areas that the ordinance was aimed at preventing.

Respondents' attack on the amended ordinance, insofar as it affects them, can be stated simply. Contending that it is the "character of the right, not of the limitation," which governs the standard of judicial review, see *Thomas* v. *Collins,* 323 U. S. 516, 530 (1945), and that zoning regulations therefore have no talismanic immunity from constitutional challenge, cf. *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269 (1964), they argue that the 1972 amendments abridge First Amendment rights by restricting the places at which an adult theater may locate on the basis of nothing more substantial than unproved fears and apprehensions about the effects of such a business upon the surrounding area. Cf., *e. g., Terminiello* v. *Chicago,* 337 U. S. 1 (1949); *Cox* v. *Louisiana,* 379 U. S. 536 (1965). And, even if Detroit's interest in preventing the deterioration of business areas is sufficient to justify the impact upon freedom of expression, the ordinance is nevertheless invalid because it im-

permissibly discriminates between types of theaters solely on the basis of their content. See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972).

I reject respondents' argument for the following reasons.

### III

This is the first case in this Court in which the interests in free expression protected by the First and Fourteenth Amendments have been implicated by a municipality's commercial zoning ordinances. Respondents would have us mechanically apply the doctrines developed in other contexts. But this situation is not analogous to cases involving expression in public forums or to those involving individual expression or, indeed, to any other prior case. The unique situation presented by this ordinance calls, as cases in this area so often do, for a careful inquiry into the competing concerns of the State and the interests protected by the guarantee of free expression.

Because a substantial burden rests upon the State when it would limit in any way First Amendment rights, it is necessary to identify with specificity the nature of the infringement in each case. The primary concern of the free speech guarantee is that there be full opportunity for expression in all of its varied forms to convey a desired message. Vital to this concern is the corollary that there be full opportunity for everyone to receive the message. See, *e. g., Whitney* v. *California,* 274 U. S. 357, 377 (1927) (Brandeis, J., concurring); *Cohen* v. *California,* 403 U. S. 15, 24 (1971); *Procunier* v. *Martinez,* 416 U. S. 396, 408–409 (1974); *Kleindienst* v. *Mandel,* 408 U. S. 753, 762–765 (1972); *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S. 748, 763–765 (1976). Motion pictures, the medium of expression involved here, are fully within the protection of the First

Amendment. *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 501–503 (1952). In the quarter century since *Burstyn* motion pictures and an analogous medium, printed books, have been before this Court on many occasions, and the person asserting a First Amendment claim often has been a theater owner or a bookseller. Our cases reveal, however, that the central concern of the First Amendment in this area is that there be a free flow from creator to audience of whatever message a film or a book might convey. Mr. Justice Douglas stated the core idea succinctly: "In this Nation every writer, actor, or producer, no matter what medium of expression he may use, should be freed from the censor." *Superior Films* v. *Department of Education,* 346 U. S. 587, 589 (1954) (concurring opinion). In many instances, for example with respect to certain criminal statutes or censorship or licensing schemes, it is only the theater owner or the bookseller who can protect this interest. But the central First Amendment concern remains the need to maintain free access of the public to the expression. See, *e. g., Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436, 442 (1957); *Smith* v. *California,* 361 U. S. 147, 150, 153–154 (1959); *Interstate Circuit* v. *Dallas,* 390 U. S. 676, 683–684 (1968); compare *Marcus* v. *Search Warrant,* 367 U. S. 717, 736 (1961), and *A Quantity of Books* v. *Kansas,* 378 U. S. 205, 213 (1964), with *Heller* v. *New York,* 413 U. S. 483, 491–492 (1973); and cf. *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70–71 (1963).

In this case, there is no indication that the application of the Anti-Skid Row Ordinance to adult theaters has the effect of suppressing production of or, to any significant degree, restricting access to adult movies. The Nortown concededly will not be able to exhibit adult movies at its present location, and the ordinance limits the po-

tential location of the proposed Pussy Cat. The constraints of the ordinance with respect to location may indeed create economic loss for some who are engaged in this business. But in this respect they are affected no differently from any other commercial enterprise that suffers economic detriment as a result of land-use regulation. The cases are legion that sustained zoning against claims of serious economic damage. See, e. g., *Zahn* v. *Board of Public Works,* 274 U. S. 325 (1927).

The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression. This prompts essentially two inquiries: (i) Does the ordinance impose any content limitation on the creators of adult movies or their ability to make them available to whom they desire, and (ii) does it restrict in any significant way the viewing of these movies by those who desire to see them? On the record in this case, these inquiries must be answered in the negative. At most the impact of the ordinance on these interests is incidental and minimal.[2] Detroit has silenced no message, has invoked no censorship, and has imposed no limitation upon those who wish to view them. The ordinance is addressed only to the places at which this type of

---

[2] The communication involved here is not a kind in which the content or effectiveness of the message depends in some measure upon where or how it is conveyed. Cf. *Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Brown* v. *Louisiana,* 383 U. S. 131 (1966); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 93 (1972).

There is no suggestion that the Nortown is, or that the Pussy Cat would be, anything more than a commercial purveyor. They do not profess to convey their own personal messages through the movies they show, so that the only communication involved is that contained in the movies themselves. Cf. *United States* v. *O'Brien,* 391 U. S. 367, 376 (1968); *Spence* v. *Washington,* 418 U. S. 405, 409–411 (1974).

expression may be presented, a restriction that does not interfere with content. Nor is there any significant over-all curtailment of adult movie presentations, or the opportunity for a message to reach an audience. On the basis of the District Court's finding, *ante,* at 71–72, n. 35, it appears that if a sufficient market exists to support them the number of adult movie theaters in Detroit will remain approximately the same, free to purvey the same message. To be sure some prospective patrons may be inconvenienced by this dispersal.[3] But other patrons, depending upon where they live or work, may find it more convenient to view an adult movie when adult theaters are not concentrated in a particular section of the city.

In these circumstances, it is appropriate to analyze the permissibility of Detroit's action under the four-part test of *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968). Under that test, a governmental regulation is sufficiently justified, despite its incidental impact upon First Amendment interests, "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free

---

[3] The burden, it should be noted, is no different from that imposed by more common ordinances that restrict to commercial zones of a city movie theaters generally as well as other types of businesses presenting similar traffic, parking, safety, or noise problems. After a half century of sustaining traditional zoning of this kind, there is no reason to believe this Court would invalidate such an ordinance as violative of the First Amendment. The only difference between such an ordinance and the Detroit ordinance lies in the reasons for regulating the location of adult theaters. The special public interest that supports this ordinance is certainly as substantial as the interests that support the normal area zoning to which all movie theaters, like other commercial establishments, long have been subject.

expression; and if the incidental restriction on . . . First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Ibid.* The factual distinctions between a prosecution for destruction of a Selective Service registration certificate, as in *O'Brien,* and this case are substantial, but the essential weighing and balancing of competing interests are the same. Cf. *Procunier* v. *Martinez,* 416 U. S., at 409–412.

There is, as noted earlier, no question that the ordinance was within the power of the Detroit Common Council to enact. See *Berman* v. *Parker,* 348 U. S., at 32. Nor is there doubt that the interests furthered by this ordinance are both important and substantial. Without stable neighborhoods, both residential and commercial, large sections of a modern city quickly can deteriorate into an urban jungle with tragic consequences to social, environmental, and economic values. While I agree with respondents that no aspect of the police power enjoys immunity from searching constitutional scrutiny, it also is undeniable that zoning, when used to preserve the character of specific areas of a city, is perhaps "the most essential function performed by local government, for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life." *Village of Belle Terre* v. *Boraas,* 416 U. S., at 13 (MARSHALL, J., dissenting).

The third and fourth tests of *O'Brien* also are met on this record. It is clear both from the chronology and from the facts that Detroit has not embarked on an effort to suppress free expression. The ordinance was already in existence, and its purposes clearly set out, for a full decade before adult establishments were brought under it. When this occurred, it is clear—indeed it is not seriously challenged—that the governmental interest prompting the inclusion in the ordinance of adult establishments was wholly unrelated to any suppression of

free expression.[4]  Nor is there reason to question that the degree of incidental encroachment upon such expression was the minimum necessary to further the purpose

[4] Respondents attack the nature of the evidence upon which the Common Council acted in bringing adult entertainment establishments under the ordinance, and which petitioners submitted to the District Court in support of it.  That evidence consisted of reports and affidavits from sociologists and urban planning experts, as well as some laymen, on the cycle of decay that had been started in areas of other cities, and that could be expected in Detroit, from the influx and concentration of such establishments.  Respondents insist that a major part of that cycle is a kind of "self-fulfilling prophecy" in which a business establishment neighboring on several of the "regulated uses" perceives that the area is going downhill economically, and moves out, with the result that a less desirable establishment takes its place—thus fulfilling the prophecy made by the more reputable business.  As noted earlier, *supra,* at 75, respondents have tried to analogize these types of fears to the apprehension found insufficient in previous cases to justify stifling free expression.  But cases like *Cox* and *Terminiello,* upon which respondents rely, involved individuals desiring to express *their own messages* rather than commercial exhibitors of films or vendors of books.  When an individual or a group of individuals is silenced, the message itself is silenced and free speech is stifled.  In the context of movies and books, the more apt analogy to *Cox* or *Terminiello* would be the censorship cases, in which a State or a municipality attempted to suppress copies of particular works, or the licensing cases in which that danger was presented.  But a zoning ordinance that merely specifies where a theater may locate, and that does not reduce significantly the number or accessibility of theaters presenting particular films, stifles no expression.

Moreover, the Common Council did not inversely zone adult theaters in an effort to protect citizens against the *content* of adult movies.  If that had been its purpose, or the effect of the amendment to the ordinance, the case might be analogous to those cited by Mr. Justice Stewart's dissent, *post,* at 85.  Moreover, an intent or purpose to restrict the communication itself because of its nature would make the *O'Brien* test inapplicable.  See *O'Brien,* 391 U. S., at 382; *Spence* v. *Washington,* 418 U. S., at 414 n. 8; cf. *Stromberg* v. *California,* 283 U. S. 359 (1931).  But the Common Council simply acted to protect the economic integrity of

of the ordinance. The evidence presented to the Common Council indicated that the urban deterioration was threatened, not by the concentration of *all* movie theaters with other "regulated uses," but only by a concentration of those that elected to specialize in adult movies.[5] The case would present a different situation had Detroit brought within the ordinance types of theaters that had not been shown to contribute to the deterioration of surrounding areas.[6]

---

large areas of its city against the effects of a predictable interaction between a concentration of certain businesses and the responses of people in the area. If it had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location.

[5] Respondents have argued that the Common Council should have restricted adult theaters' hours of operation or their exterior advertising instead of refusing to allow their clustering with other "regulated uses." Most of the ill effects, however, appear to result from the clustering itself rather than the operational characteristics of individual theaters. Moreover, the ordinance permits an exception to its 1,000-foot restriction in appropriate cases. See *ante,* at 54 n. 7.

[6] In my view MR. JUSTICE STEWART's dissent misconceives the issue in this case by insisting that it involves an impermissible time, place, and manner restriction based on the content of expression. It involves nothing of the kind. We have here merely a decision by the city to treat certain movie theaters differently because they have markedly different effects upon their surroundings. See n. 3, *supra.* Moreover, even if this were a case involving a special governmental response to the content of one type of movie, it is possible that the result would be supported by a line of cases recognizing that the government can tailor its reaction to different types of speech according to the degree to which its special and overriding interests are implicated. See, *e. g., Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 509–511 (1969); *Procunier* v. *Martinez,* 416 U. S. 396, 413–414 (1974); *Greer* v. *Spock,* 424 U. S. 828, 842–844 (1976) (POWELL, J., concurring); cf. *CSC* v. *Letter Carriers,* 413 U. S. 548 (1973). It is not analogous to *Police Dept.*

## IV

The dissenting opinions perceive support for their position in *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205 (1975). I believe this perception is a clouded one. The Jacksonville and Detroit ordinances are quite dissimilar, and our analysis of the infirmities of the former is inapplicable to the latter. In *Erznoznik*, an ordinance purporting to prevent a nuisance, not a comprehensive zoning ordinance, prohibited the showing of films containing nudity by drive-in theaters when the screens were visible from a public street or place. The governmental interests advanced as justifying the ordinance were three: (i) to protect citizens from unwilling exposure to possibly offensive materials; (ii) to protect children from such materials; and (iii) to prevent the slowing of passing traffic and the likelihood of resulting accidents. We found the Jacksonville ordinance on its face either overbroad or underinclusive with respect to each of these asserted purposes. As to the first purpose, the ordinance was overbroad because it proscribed the showing of any nudity, however innocent or educational. Moreover, potential viewers who deemed particular nudity to be offensive were not captives; they had only to look elsewhere. *Id.*, at 210–212; see *Cohen* v. *California*, 403 U. S., at 21. As to minors the Jacksonville ordinance was overbroad because it "might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach." 422 U. S., at 213. Finally, the ordinance was not rationally tailored to support its asserted purpose as a traffic regulation. By proscribing "even the most fleeting and innocent glimpses of nudity," it was strikingly underinclusive—omitting "a wide va-

---

*of Chicago* v. *Mosley,* 408 U. S. 92 (1972), in which no governmental interest justified a distinction between the types of messages permitted in the public forum there involved.

riety of other scenes in the customary screen diet . . . [that] would be [no] less distracting to the passing motorist." *Id.*, at 214–215.

In sum, the ordinance in *Erznoznik* was a misconceived attempt directly to regulate content of expression. The Detroit zoning ordinance, in contrast, affects expression only incidentally and in furtherance of governmental interests wholly unrelated to the regulation of expression. At least as applied to respondents, it does not offend the First Amendment. Although courts must be alert to the possibility of direct rather than incidental effect of zoning on expression, and especially to the possibility of using the power to zone as a pretext for suppressing expression, it is clear that this is not such a case.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN join, dissenting.

The Court today holds that the First and Fourteenth Amendments do not prevent the city of Detroit from using a system of prior restraints and criminal sanctions to enforce content-based restrictions on the geographic location of motion picture theaters that exhibit nonobscene but sexually oriented films. I dissent from this drastic departure from established principles of First Amendment law.

This case does not involve a simple zoning ordinance,[1] or a content-neutral time, place, and manner restriction,[2]

---

[1] Contrast *Village of Belle Terre* v. *Boraas,* 416 U. S. 1, which upheld a zoning ordinance that restricted no substantive right guaranteed by the Constitution.

[2] Here, as in *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, and *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, the State seeks to impose a selective restraint on speech with a particular content. It is not all movie theaters which must comply with Ordinances No. 742–G and No. 743–G, but only those "used for present-

or a regulation of obscene expression or other speech that is entitled to less than the full protection of the First Amendment.[3] The kind of expression at issue here is no doubt objectionable to some, but that fact does not diminish its protected status any more than did the particular content of the "offensive" expression in *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205 (display of nudity on a drive-in movie screen); *Lewis* v. *City of New Orleans,* 415 U. S. 130 (utterance of vulgar epithet); *Hess* v. *Indiana,* 414 U. S. 105 (utterance of vulgar remark); *Papish* v. *University of Missouri Curators,* 410 U. S. 667 (indecent remarks in campus newspaper); *Cohen* v. *California,* 403 U. S. 15 (wearing of clothing inscribed with a vulgar remark); *Brandenburg* v. *Ohio,* 395 U. S. 444 (utterance of racial slurs); or *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684 (alluring portrayal of adultery as proper behavior).

What this case does involve is the constitutional permissibility of selective interference with protected speech whose content is thought to produce distasteful effects. It is elementary that a prime function of the First Amendment is to guard against just such interference.[4] By refusing to invalidate Detroit's ordinance the Court rides roughshod over cardinal principles of First Amend-

---

ing material distinguished or characterized by an emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas' . . . ." The ordinances thus " 'sli[p] from the neutrality of time, place, and circumstance into a concern about content.' This is never permitted." *Police Dept. of Chicago* v. *Mosley, supra,* at 99 (citation omitted). See, *e. g., Hudgens* v. *NLRB,* 424 U. S. 507, 520; *Grayned* v. *City of Rockford,* 408 U. S. 104, 115.

[3] The regulatory scheme contains no provision for a judicial determination of obscenity. As the Court of Appeals correctly held, the material displayed must therefore be presumed to be fully protected by the First Amendment. 518 F. 2d 1014, 1019.

[4] See, *e. g., Terminiello* v. *Chicago,* 337 U. S. 1, 4–5.

ment law, which require that time, place, and manner regulations that affect protected expression be content neutral except in the limited context of a captive or juvenile audience.[5]  In place of these principles the Court invokes a concept wholly alien to the First Amendment. Since "few of us would march our sons and daughters off to war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the theaters of our choice," *ante,* at 70, the Court implies that these films are not entitled to the full protection of the Constitution.  This stands "Voltaire's immortal comment," *ibid.,* on its head.  For if the guarantees of the First Amendment were reserved for expression that more than a "few of us" would take up arms to defend, then the right of free expression would be defined and circumscribed by current popular opinion.  The guarantees of the Bill of Rights were designed to protect against precisely such majoritarian limitations on individual liberty.[6]

---

[5] See, *e. g., Hudgens* v. *NLRB, supra; Erznoznik* v. *City of Jacksonville, supra; Police Dept. of Chicago* v. *Mosley, supra.*  This case does not involve state regulation narrowly aimed at preventing objectionable communication from being thrust upon an unwilling audience.  See *Erznoznik* v. *City of Jacksonville, supra,* at 209. Contrast *Lehman* v. *City of Shaker Heights,* 418 U. S. 298; *Rowan* v. *Post Office Dept.,* 397 U. S. 728.  Nor is the Detroit ordinance narrowly aimed at protecting children from exposure to sexually oriented displays that would not be judged obscene by adult standards.  Contrast *Ginsberg* v. *New York,* 390 U. S. 629.

[6] See, *e. g., Terminiello* v. *Chicago, supra,* at 4–5.  The Court stresses that Detroit's content-based regulatory system does not preclude altogether the display of sexually oriented films.  But, as the Court noted in a similar context in *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, this is constitutionally irrelevant, for " 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " *Id.,* at 556, quoting *Schneider* v. *State,* 308 U. S. 147, 163.  See also *Interstate Circuit* v. *Dallas,* 390 U. S. 676; *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58.

The fact that the "offensive" speech here may not address "important" topics—"ideas of social and political significance," in the Court's terminology, *ante,* at 61—does not mean that it is less worthy of constitutional protection. "Wholly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons." *Winters* v. *New York,* 333 U. S. 507, 528 (Frankfurter, J., dissenting); accord, *Cohen* v. *California, supra,* at 25. Moreover, in the absence of a judicial determination of obscenity, it is by no means clear that the speech is not "important" even on the Court's terms. "[S]ex and obscenity are not synonymous. . . . The portrayal of sex, *e. g.,* in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Roth* v. *United States,* 354 U. S. 476, 487 (footnotes omitted). See also *Kingsley Pictures Corp.* v. *Regents, supra,* at 688–689.

I can only interpret today's decision as an aberration. The Court is undoubtedly sympathetic, as am I, to the well-intentioned efforts of Detroit to "clean up" its streets and prevent the proliferation of "skid rows." But it is in those instances where protected speech grates most unpleasantly against the sensibilities that judicial vigilance must be at its height.

Heretofore, the Court has not shied from its responsibility to protect "offensive" speech from governmental interference. Just last Term in *Erznoznik* v. *City of Jacksonville, supra,* the Court held that a city could not, consistently with the First and Fourteenth Amendments, make it a public nuisance for a drive-in movie theater to show films containing nudity if the screen were visible

from a public street or place. The factual parallels between that case and this one are striking. There, as here, the ordinance did not forbid altogether the "distasteful" expression but merely required an alteration in the physical setting of the forum. There, as here, the city's principal asserted interest was in minimizing the "undesirable" effects of speech having a particular content. And, most significantly, the particular content of the restricted speech at issue in *Erznoznik* precisely parallels the content restriction embodied in § 1 of Detroit's definition of "Specified Anatomical Areas." Compare Jacksonville Municipal Code § 330.313 with Detroit Ordinance No. 742–G, § 32. 0007. In short, *Erznoznik* is almost on "all fours" with this case.

The Court must never forget that the consequences of rigorously enforcing the guarantees of the First Amendment are frequently unpleasant. Much speech that seems to be of little or no value will enter the marketplace of ideas, threatening the quality of our social discourse and, more generally, the serenity of our lives. But that is the price to be paid for constitutional freedom.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL join, dissenting.

I join MR. JUSTICE STEWART's dissent, and write separately to identify an independent ground on which, for me, the challenged ordinance is unconstitutional. That ground is vagueness.

I

We should put ourselves for a moment in the shoes of the motion picture exhibitor. Let us suppose that, having previously offered only a more innocuous fare, he

decides to vary it by exhibiting on certain days films from a series which occasionally deals explicitly with sex. The exhibitor must determine whether this places his theater into the "adult" class prescribed by the challenged ordinance. If the theater is within that class, it must be licensed, and it may be entirely prohibited, depending on its location.

"Adult" status *vel non* depends on whether the theater is "used for presenting" films that are "distinguished or characterized by an emphasis on" certain specified activities, including sexual intercourse, or specified anatomical areas.[1] It will be simple enough, as the operator screens films, to tell when one of these areas or activities is being depicted, but if the depiction represents only a part of the films' subject matter, I am at a loss to know how he will tell whether they are "distinguished or characterized by an emphasis" on those areas and activities. The ordinance gives him no guidance. Neither does it instruct him on how to tell whether, assuming the films in question are thus "distinguished or characterized," his theater is being "used for presenting" such films. That phrase could mean *ever* used, *often* used, or *predominantly* used, to name a few possibilities.

Let us assume the exhibitor concludes that the film series will render his showhouse an "adult" theater. He still must determine whether the operation of the theater is prohibited by virtue of there being two other "regulated uses" within 1,000 feet. His task of determining whether his own theater is "adult" is suddenly multiplied by however many neighbors he may have that arguably are within that same class. He must, in other

---

[1] See *ante*, at 52–55, and nn. 3–7. I reproduce, or cite specifically to, only those sections of the challenged ordinance that are not set out in the Court's opinion.

words, know and evaluate not only his own films, but those of any competitor within 1,000 feet. And neighboring theaters are not his only worry, since the list of regulated uses also includes "adult" bookstores, "Group 'D' Cabaret[s]," sellers of alcoholic beverages for consumption on the premises, hotels, motels, pawnshops, pool halls, public lodging houses, "secondhand stores," shoeshine parlors, and "taxi dance halls." The exhibitor must master all these definitions. Some he will find very clear, of course; others less so. A neighboring bookstore is "adult," for example, if a "substantial or significant portion of its stock in trade" is "distinguished or characterized" in the same way as the films shown in an "adult" theater.

The exhibitor's compounded task of applying the statutory definitions to himself and his neighbors, furthermore, is an ongoing one. At any moment he could become a violator of the ordinance because some neighbor has slipped into a "regulated use" classification. He must know, for example, if the adjacent hotel has opened a bar or shoeshine "parlor" on the premises, though he may still be uncertain whether the hotel as a whole constitutes more than one "regulated use." He must also know the moment when the stock in trade of neighboring bookstores and theaters comes to be of such a character, and predominance, as to render them "adult." Lest he let down his guard, he should remember that if he miscalculates on any of these issues, he may pay a fine or go to jail.[2]

It would not be surprising if, under the circumstances, the exhibitor chose to forgo showing the film series altogether. Such deterrence of protected First Amendment activity in the "gray area" of a statute's possible

---

[2] Official Zoning Ordinance of Detroit § 69.000.

coverage is, of course, one of the vices of vagueness. A second is the tendency of vague statutory standards to grant excessive and effectively unreviewable discretion to the officials who enforce those standards. That vice is also present here. It is present because the vague standards already described are left to the interpretation and application of law enforcement authorities.[3] It is introduced even more dangerously by the indefinite standards under which city officials are empowered to grant or deny licenses for "adult" theaters, and also waivers of the 1,000-foot rule.[4]

All "adult" theaters must be licensed, and licenses are dispensed by the mayor. The ordinance does not specify the criteria for licensing, except in one respect. The mayor is empowered to refuse an "adult" theater license, or revoke it at any time,

> "upon proof submitted to him of the violation . . . , within the preceding two years, of any criminal statute . . . or [zoning] ordinance . . . which evidences a flagrant disregard for the safety or welfare of either the patrons, employees, or persons residing or doing business nearby." Code of Detroit § 5–2–3.

---

[3] A special opportunity for arbitrary or discriminatory application of the ordinance is apparently supplied by the operation of the 1,000-foot rule. Presumably, only one of three "regulated uses" within a 1,000-foot area must be eliminated in order for the remaining two to become legal. For all that appears from the ordinance, the choice of which use to eliminate is left entirely to the enforcement authorities.

[4] These two features of the ordinance constitute prior restraints and are challengeable on that ground alone. Cf. *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546 (1975). Since, for me, the most glaring defect in the operation of these restraints is the vagueness of the standards governing their applications, however, only the vagueness point is pursued here.

If the operation of an "adult" theater would violate the 1,000-foot rule, the exhibitor must obtain the approval not only of the mayor but of the City Planning Commission, which is empowered to waive the rule. It may grant a waiver if it finds that the operation of an "adult" theater, in addition to satisfying several more definite criteria, "will not be contrary to the public interest or injurious to nearby properties," or violative of "the spirit and intent" of the ordinance.

## II

Just the other day, in *Hynes* v. *Mayor of Oradell,* 425 U. S. 610 (1976), we reaffirmed the principle that in the First Amendment area " 'government may regulate . . . only with narrow specificity,' " *NAACP* v. *Button,* 371 U. S. 415, 433 (1963), avoiding the use of language that is so vague that "men of common intelligence must necessarily guess at its meaning." *Connally* v. *General Constr. Co.,* 269 U. S. 385, 391 (1926). In *Hynes* we invalidated for its vagueness an ordinance that required "Civic Groups and Organizations," and also anyone seeking to "call from house to house . . . for a recognized charitable . . . or . . . political campaign or cause," to register with the local police "for identification only." We found it intolerably unclear what "Groups and Organizations" were encompassed, what was meant by a "cause," and what was required by way of "identification." I fail to see how a statutory prohibition as difficult to understand and apply as the 1,000-foot rule for "adult" theaters can survive if the ordinance in *Hynes* could not.

The vagueness in the licensing and waiver standards of this ordinance is more pernicious still. The mayor's power to deny a license because of "flagrant disregard" for the "safety or welfare" of others is apparently exercisable only over those who have committed some

infraction within the previous two years,[5] but I do not see why even those persons should be subject to standardless licensing discretion of precisely the kind that this Court so many times has condemned. See *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969); *Staub* v. *City of Baxley,* 355 U. S. 313 (1958); *Kunz* v. *New York,* 340 U. S. 290 (1951); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951); *Saia* v. *New York,* 334 U. S. 558 (1948); *Schneider* v. *State,* 308 U. S. 147, 163–164 (1939); *Hague* v. *CIO,* 307 U. S. 496 (1939); *Lovell* v. *Griffin,* 303 U. S. 444 (1938). For the exhibitor who must obtain a waiver of the 1,000-foot rule, the City Planning Commission likewise functions effectively as a censor, constrained only by its perception of the "public interest" and the "spirit and intent" of the ordinance. This Court repeatedly has invalidated such vague standards for prior approval of film exhibitions. See *Interstate Circuit* v. *Dallas,* 390 U. S. 676, 683 (1968), and cases cited.[6] Indeed, a standard much like the waiver stand-

---

[5] The ordinance empowers the mayor to act "upon proof submitted to him of [a] violation." It is possible that he may entertain evidence not only of convictions but also of violations themselves, even though these have not been otherwise adjudicated. Whether legal infractions must be otherwise adjudicated or not, the mayor clearly retains the power to revoke a license for "flagrant disregard," should infractions occur at any time after the license's issuance.

[6] *Interstate Circuit* disposes of any argument that excessively vague standards may be permitted here because the film exhibitions are not banned entirely, but merely prohibited in a particular place. The ordinance invalidated in *Interstate Circuit* required exhibitors to submit films for official determination whether persons under 16 should be excluded from the film exhibitions. It thus threatened the exhibitor with a loss of only part of his audience. The effect of the present ordinance is more severe, since if the exhibitor has only one theater, he is completely foreclosed. See also *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S., at 556 n. 8.

94

ard in this case was the one found wanting in *Gelling* v. *Texas*, 343 U. S. 960 (1952) (censor could ban films "of such character as to be prejudicial to the best interests of the people of said City").

It is true that the mayor and the Planning Commission review the applications of theaters, rather than individual films. It might also be argued that at least if they adhere to the "spirit and intent" of the ordinance, their principal concern will be with the blighting of the cityscape, rather than that of the minds of their constituents. But neither of these aspects of the case alters its basic and dispositive facts: persons seeking to exhibit "adult," but protected, films must secure, in many cases, the prior approval of the mayor and City Planning Commission; they inevitably will make their decisions by reference to the content of the proposed exhibitions; they are not constrained in doing so by "narrowly drawn, reasonable and definite standards." *Niemotko* v. *Maryland*, 340 U. S., at 271. This may be a permissible way to control pawnshops, pool halls, and the other "regulated uses" for which the ordinance was originally designed. It is not an acceptable way, in the light of the First Amendment's presence, to decide who will be permitted to exhibit what films in what places.

### III

The Court today does not really question these settled principles, or raise any doubt that if they were applied in this case, the challenged ordinance would not survive. The Court reasons, instead, that these principles need not be applied in this case because the plaintiffs themselves are clearly within the ordinance's proscriptions, and thus not affected by its vagueness. Our usual practice, as the Court notes, is to entertain facial challenges based on vagueness and overbreadth by anyone subject to a statute's proscription. The reasons given for de-

parting from this practice are (1) that the ordinance will have no "significant deterrent effect on the exhibition of films protected by the First Amendment"; (2) that the ordinance is easily susceptible of "a narrowing construction"; and (3) that "there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance." *Ante,* at 60, 61.

As to the first reason, I disagree on the facts, as is clear from the initial section of this opinion.[7] As to the second, no easy "narrowing construction" is proposed, and I doubt that one exists, particularly since (due to the operation of the 1,000-foot rule) not only the "used for presenting" and "characterized by an emphasis" language relating to "adult" theaters, and the "flagrant disregard" and "public interest" language of the licensing and waiver provisions, but also the definitions of *other* regulated uses must all be reduced to specificity. See also *Hynes* v. *Mayor of Oradell,* 425 U. S., at 622 ("we are without power to remedy the [vagueness] defects by giving the ordinance constitutionally precise content").

---

[7] In *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205 (1975), the case on which the Court relies for the proposition that only statutes having a "significant deterrent effect" may be facially challenged, such an effect in fact was found to exist. The ordinance there at issue prohibited drive-in theaters from exhibiting films in which nude parts of the human body would be "visible from any public street or public place." We perceived a "real and substantial" deterrent effect in the "unwelcome choice" to which the ordinance put exhibitors: "either [to] restrict their movie offerings or construct adequate protective fencing which may be extremely expensive or even physically impracticable." *Id.,* at 217. In the present case the second horn of the dilemma is even sharper: the construction (or acquisition) of an entirely new theater.

As to the third reason, that "adult" material is simply entitled to less protection, it certainly explains the lapse in applying settled vagueness principles, as indeed it explains this whole case. In joining MR. JUSTICE STEWART I have joined his forthright rejection of the notion that First Amendment protection is diminished for "erotic materials" that only a "few of us" see the need to protect.

We should not be swayed in this case by the characterization of the challenged ordinance as merely a "zoning" regulation, or by the "adult" nature of the affected material. By whatever name, this ordinance prohibits the showing of certain films in certain places, imposing criminal sanctions for violation of the ban. And however distasteful we may suspect the films to be, we cannot approve their suppression without any judicial finding that they are obscene under this Court's carefully delineated and considered standards.