OPINION CASTILLO, Chief Judge. {1} The Guild Cinema (the Guild), a locally owned art-house movie theater in the Nob Hill neighborhood of the City of Albuquerque (the City), was prosecuted under the City’s zoning regulations covering adult amusement establishments for showing one pornographic film during a weekend festival ofX-rated fare. The Guild argues thatthe City’s crackdown on the showing of just one adult film outside of a zone designated for adult entertainment violates a mainstream theater’s free-speech rights by misusing an ordinance that is unconstitutionally vague and unfairly applied in this instance. We conclude that the ordinance is not vague and was not unconstitutionally applied, and we affirm. I. BACKGROUND {2} The parties stipulated to the facts before the district court. Pangaea Cinema, LLC does business as a single-screen movie theater known as the Guild Cinema in the Nob Hill neighborhood of the City along East Central Avenue. Although its most common fare consists of independent feature films and documentaries, in November 2008 the Guild played host to its second annual “Pornotopia” festival, a weekend slate of erotic films. During the festival’s second day, two code enforcement officers for the City attended two film screenings. The officers, one male and one female, both concluded that one of the films, “Couch Surfers: Trans Men in Action,” met the definition of an adult film under the City’s Zoning Code (the Code). Albuquerque, N.M., Zoning Code ch. 14, art. XVI (2008, as amended through2011). A specific ordinance within the Code, Albuquerque, N.M., Rev. Ordinances ch. 14, art. XVI, § 14-16-1-5(B) (the Ordinance) allows adult films to be shown only in specified zones of the City and prohibits the public screening of such films in all other areas, including the business district of Nob Hill where the Guild is situated. A criminal complaint was filed charging the Guild with operating as an adult amusement establishment outside of an area zoned for such activity. The Guild concedes that the film it showed featured “specified anatomical areas” and “specified sexual activities” as defined by the Ordinance. The City acknowledges that the exhibition of one adult film did not cause negative secondary effects, such as criminal activity. Affidavits filed by some of the Guild’s commercial neighbors reported positive effects from the event, in particular, increased business at their establishments during that weekend. {3} The Guild was convicted in metropolitan court, and it appealed to district court. The parties stipulated to facts and exhibits, and they agreed to forgo a trial and agreed instead to have the matter decided on the Guild’s motion to dismiss the charge. The district court affirmed the findings of the metropolitan court, upheld the conviction in a thirty-one-page opinion, and fined the cinema $500 for the infraction. The Guild filed a motion for reconsideration that was denied by the district court. This appeal followed. II. DISCUSSION {4} The Guild argues that it should not be categorized as an adult amusement establishment under what it considers to be the City’s unconstitutionally vague Ordinance and that, because no secondary effects resulted from the showing of the film, the City exceeded its zoning authority by impermissibly targeting the content of the Guild’s speech in violation of the theater’s free-speech rights. We take those three arguments in turn, and we review them de novo. See Gomez v. Chavarria, 2009-NMCA-035, ¶ 6, 146 N.M. 46, 206 P.3d 157 (stating that constitutional questions and issues of statutory construction are reviewed de novo). A. The Ordinance Need Not Be More Narrowly Construed {5} The Guild first asks us to avoid the constitutional issues and find that a close reading of the City’s Ordinance leads to the conclusion that the Ordinance does not apply to the Guild’s screening of a single adult film. The Ordinance reads, in pertinent part: ADULT AMUSEMENT ESTABLISHMENT. An establishment such as an auditorium, bar, cabaret, concert hall, nightclub, restaurant, theater, or other commercial establishment that provides amusement or entertainment featuring one or more of the following: (1) A live performance, act or escort service distinguished or characterized by an emphasis on the depiction, description, exposure, or representation of specified anatomical areas or the conduct or simulation of specified sexual activities; or (2) Audio or video displays, computer displays, films, motion pictures, slides or other visual representations or recordings characterized or distinguished by an emphasis on the depiction, description, exposure or representation of specified anatomical areas or the conduct or simulation of specified sexual activities. Albuquerque,N.M., Rev. Ordinances § 14-16-1-5(B) (emphasis added). Another applicable ordinance states: “Any use not designated a permissive or conditional use in a zone is specifically prohibited from that zone, except as otherwise provided herein.” Albuquerque, N.M., Rev. Ordinances ch. 14, art. XVI, § 14-16-1-3(B) (1980). {6} When interpreting an ordinance, we look to its language: “If the language makes the [ordinance] understandable and sensible, that is all that is necessary to uphold it as valid.” State ex rel. Children, Youth & Families Dep’t v. Shawna C., 2005-NMCA-066, ¶ 34, 137 N.M. 687, 114 P.3d 367 (internal quotation marks and citation omitted). “Legislative intent is determined primarily from the language of the statute and from the legislative purpose to be achieved.” State v. Andrews, 1997-NMCA-017, ¶ 5, 123 N.M. 95, 934 P.2d 289 (citation omitted). “In order to construe faithfully what the Legislature meant[,] ... we consider the plain meaning of the words used in the context of the statutory text as a whole.” Quynh Truong v. Allstate Ins. Co., 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (citation omitted). “A statute is read literally if its words are plain and unambiguous, provided such a construction would not lead to an injustice, absurdity, or contradiction.” Andrews, 1997-NMCA-017, ¶5. {7} In the case before us, the portion of the Ordinance italicized above defines an adult amusement establishment, in one instance, as a “theater . . . that provides . . . entertainment featuring... motion pictures ... distinguished by an emphasis on . . . specified anatomical areas or the conduct or simulation of specified sexual activities.” The Guild first zeroes in on the word “featuring” and argues that it does not encompass the showing of just one adult film; rather it should be interpreted to mean “regularly featur[ing]” such films. The dissent agrees with the Guild and concludes that characterizing the Guild as an “adult amusement establishment” for its single showing of an adult film defies common understanding. Dissenting Opinion, ¶ 50. We disagree and explain. As we have stated, we look to the plain language of the Ordinance. To include the concept that the showing must be regular, we would have to add a word that is not there and rely on other jurisdictions that interpret differently worded statutes. “Feature,” in its verb form, is defined as “to make a feature of; give special prominence to,” with the following example given: “the theater was featuring a murder-mystery film.” Webster’s Third New Int’l Dictionary 832 (1976). As the district court noted, movie theaters and television stations often advertise the presentation of a feature film. To bolster its argument, the Guild ventures to other jurisdictions for interpretive support. It unconvincingly relies on one case that is based on an ordinance that does not use the word “feature”; one case in which the ordinance explicitly uses the phrase “regularly features”; and two cases, including an unpublished opinion out of Alaska, that deal with live “adult cabaret.” See Schultz v. City of Cumberland, 228 F.3d 831 (7th Cir. 2000); Schmitty’s City Nightmare, LLC v. City of Fond Du Lac, 391 F. Supp. 2d 745 (E.D. Wis. 2005); Stevens v. Matanuska-Susitna Borough, Nos. A-9674, A-9683, 2007 WL 2143008 (Alaska Ct. App. July 25, 2007); People v. Super. Ct. (Lucero), 774 P.2d 769 (Cal. 1989). None is persuasive or materially on point with the statutory analysis in this case. {8} Finally, the Guild points out a difference between the Ordinance’s reference to live exhibition and its reference to the exhibition of films. The Ordinance uses singular language to refer to any live exhibition and plural language for the exhibition of film. According to the Guild, this language difference suggests that just one live performance could be expected to produce negative secondary effects but that it would take multiple exhibitions of films to create those effects and thus trigger enforcement. We disagree. The Ordinance explicitly provides that any plural language used includes the singular and vice versa, Albuquerque,N.M.,Rev. Ordinances § 14-16-1-5(A)(2), and we see no reason to find an exception to that common statutory language. Cf. State ex rel. Richardson v. 5th Jud. Nominating Comm’n, 2007-NMSC-023, ¶ 17, 141 N.M. 657, 160 P.3d 566. Nothing in the Ordinance suggests that the City Council made a distinction between live acts and feature films. {9} We are not persuaded by the Guild’s arguments that the Ordinance may and should be more narrowly construed to avoid constitutional analysis. We agree with the district court’s interpretation. When the Ordinance is read literally, nothing in its plain meaning compels us to transform the word “featuring” into “regularly featuring.” Thus, we conclude that any theater which features an adult film — i.e., hosts a screening of a movie that depicts the anatomical areas and sexual acts listed in the Ordinance — is an adult amusement establishment as defined by the Ordinance, even if only one movie is shown, and, as such, it is subject to the terms of the Ordinance. B. The Ordinance Is Not Unconstitutionally Vague {10} The Guild next contends that the Ordinance — specifically its definition of an “adult amusement establishment” — fails to give adequate notice that the screening of just one adult film outside a permissible zone transforms a mainstream theater into an adult amusement establishment. Thus, the Guild asks us to declare the Ordinance void for vagueness as applied to the Guild. {11} “A strong presumption of constitutionality underlies each statute, and the defendant has the burden to prove unconstitutionality beyond all reasonable doubt.” Shawna C., 2005-NMCA-066, ¶ 32. The United States Constitution “does not require impossible standards of clarity in statutes, only that the language convey}] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.” Id. ¶ 34 (alteration in original) (internal quotation marks and citation omitted). Neither does the Constitution require “mathematical certainty from our language},]” but rather “flexibility and reasonable breadth}.]” Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) (internal quotation marks and citation omitted). Our task is not to appraise the wisdom of the City’s decision, because a city ‘“must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.’” City of Renton v. Playtime Theatres, Inc. (Renton), 475 U.S. 41, 52 (1986) (quoting Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 71 (1976)). Thus, we will “strive to avoid” a remedy that requires us to “tamper with the text” of an ordinance. United States v. Nat’l Treasury Emps. Union, 513 U.S. 454, 478 (1995). As the New Mexico Supreme Court has stated, In the enactment of statutes},] reasonable precision is required. Legislative enactments may be declared void for uncertainty if their meaning is so uncertain that the court is unable, by the application of known and accepted rules of construction, to determine what the [Legislature intended with any reasonable degree of certainty. But absolute or mathematical certainty is not required in the framing of a statute. State ex rel. Bliss v. Dority, 55 N.M. 12, 29, 225 P.2d 1007, 1017 (1950). {12} A statute or ordinance will be deemed to be unconstitutionally vague if it has one of two fatal characteristics: it fails to give people of ordinary intelligence a reasonable opportunity to know what activity is prohibited so as to allow them to conform their actions to the law, or it fails to provide explicit standards and thus invites police officers, prosecutors, judges, or juries to engage in arbitrary and discriminatory enforcement. State v. Laguna, 1999-NMCA-152, ¶¶ 25-26, 128 N.M. 345, 992 P.2d 896. Finally, we have observed that a defendant “will not succeed if the statute clearly applied to the defendant’s conduct.” Shawna C., 2005-NMCA-066, ¶ 32. The standard two-step analysis follows. 1. Notice to Individuals of Ordinary Intelligence {13} The Guild points to a dearth of previous similar convictions by the City and to narrow interpretations of such laws in other jurisdictions in an effort to argue that a proprietor in its position would logically conclude that the Ordinance does not apply to an independent cinema showing only one adult film. As we discussed above, the decisions of other jurisdictions are not on point or persuasive. We instead focus on how the Ordinance applies to the facts before us, based on an interpretation by a reasonable person. See Dickerson v. Napolitano, 604 F.3d 732, 745-46 (2d Cir. 2010) (“The standard is an objective one. Courts ask whether the law presents an ordinary person with sufficient notice of . . . what conduct is prohibited or proscribed}.]” (internal quotation marks and citations omitted)). {14} Two recent federal cases offer guidance in judging whether a statute or ordinance gives adequate notice to people that their behavior is subject to a legislation’s proscriptions. In Holder v. Humanitarian Law Project,__U.S.__,__, 130 S. Ct. 2705, 2712-14 (2010), United States citizens and groups sought an injunction to prohibit enforcement of a criminal ban on providing “material support” or “expert advice or assistance” to designated foreign terrorist organizations, alleging unconstitutional vagueness of the language of the statute. Id. (internal quotation marks and citation omitted). Noting that “perfect clarity and precise guidance have never been required” in the drafting of a statute — even one limiting expressive activity — the United States Supreme Court concluded: “[The plaintiffs’ activities ... fall comfortably within the scope of‘expert advice or assistance’: A reasonable person would recognize that teaching [an organization] how to petition for humanitarian relief before the United Nations involves advice derived from, as the statute puts it, ‘specialized knowledge.’” Id. at 2719-20 (internal quotation marks and citations omitted). The Court focused on the meaning as applied to the parties before it: “Of course, the scope of the material-support statute may not be clear in every application. But the dispositive point here is that the statutory terms are clear in their application to plaintiffs’ proposed conduct, which means that plaintiffs’ vagueness challenge must fail.” Id. at 2720. {15} Similarly, in Dickerson, a New York statute prohibited people from entering federal buildings while carrying unauthorized police shields or other insignia “in any way resembling” that worn by police officers. See 604 F.3d at 736-37 (emphasis and citation omitted). The plaintiffs, carrying authentic-looking but unauthorized police badges into a federal building, sued over unconstitutional enforcement of the statute and appealed when the case was dismissed. See id. The court stated that a literal reading of the statute could lead to such absurd results as criminalizing a children’s game of cops and robbers, and might be susceptible to a facial challenge; however, the court held that an analysis of the statute, as applied to the plaintiffs, gave them notice that their actions would violate the law. See id. at 746. The court, conceding the statute suffered from “ambiguity as to the margins,” concluded: “[N]either the widespread availability of hats and T-shirts bearing the NYPD logo, nor the prevalence of toy badges, would be likely to confuse a reasonable person as to the illegality of an adult carrying a facsimile of a police shield in his belongings while entering a government building.” Id. at 747. {16} Like the parties in Holder and Dickerson, the Guild challenges an ordinance that might be hampered by ambiguity in some settings. But when the Guild exhibited what both parties agree was an adult film, a reasonable theater owner would have been on notice that the Ordinance governing adult amusement establishments would come into play. The Guild, seeking to exploit any weakness it might find in the Ordinance, offers a hypothetical: If the theater had exhibited a five-minute movie featuring topless women discussing Descartes, would it be fairly punished under the Ordinance? That is a provocative question but a red herring; such a hypothetical might help sustain a facial challenge, but here, with an as-applied challenge, we deal with the concrete facts at hand. And the Guild does not dispute that it showed an adult film outside of a circumscribed zone as defined in the Ordinance. Had it merely shown an art film featuring some nudity — as many mainstream and independent cinemas do on a regular basis — and been cited for violating the Ordinance, then the Guild could make that argument. In this case, such a hypothetical has no bearing on our analysis. Relying on our statutory interpretation above, we determine that the Guild knew it was showing a film as defined by the Ordinance and, like the parties in Holder and Dickerson, had adequate notice that its conduct was prohibited by the Ordinance as applied in this situation. 2. Standards or Guidelines for Enforcement {17} Alternatively, the Guild argues that the Ordinance invites arbitrary and discriminatory enforcement. A legislative body may not “impermissibly delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application}.]” State v. Myers, 2011-NMSC-028, ¶ 39, 150 N.M. 1, 256 P.3d 13 (emphasis, internal quotation marks, and citation omitted). We have acknowledged, though, that the duties of law enforcement will always require the exercise of a certain degree of police judgment. Shawna C., 2005-NMCA-066, ¶ 39. {18} In the case before us, we are provided with no evidence that the City selectively enforced the Ordinance or singled out the Guild. We also find no evidence that the City improperly trained its officers in identifying adult films and citing violators of the Ordinance. In its argument, the Guild deals mainly in conjecture and speculation, and it relies on the suggestion that because the Guild knows of no other mainstream theater that has been prosecuted for the single showing of an adult film that the City has arbitrarily enforced the Ordinance. It cites a federal case from Colorado — featuring a bakery owner selling a number of adult-oriented cakes — to support its argument. See Pensack v. City & Cnty. of Denver, 630 F. Supp. 177 (D. Colo. 1986). But in Pensack, where the court found inadequate notice to the bakery and insufficient standards for law enforcement, the ordinance at issue defined adult establishments as those having “substantial” or “significant” portions of its stock emphasizing sexual activities. Id. at 178. Here, the Ordinance has no threshold standard for movie theaters exhibiting adult fare. Pensack’s reasoning does not apply here. In the absence of any other evidence, we cannot conclude that the Ordinance is susceptible to arbitrary or discriminatory enforcement, particularly when applied to the Guild’s screening of what it admits to be an adult film. Because the Guild fails both prongs of the analysis, we conclude that the Ordinance is not unconstitutionally vague as applied in this instance. C. The Ordinance Is a Proper Time-Place-Manner Restriction and Does Not Abridge Freedom of Speech As Applied to the Guild 1. N.M. Constitution Article II, Section 17 vs. First Amendment {19} The parties begin with a debate over whether Article II, Section 17 of the New Mexico Constitution affords free-speech rights that are greater than those declared in the First Amendment of the United States Constitution. The Guild asks that we “bear this heightened protection in mind” when conducting our analysis and to err on the side of favoring free-speech rights when faced with a split in the law of other jurisdictions. For that argument, the Guild relies on City of Farmington v. Fawcett, 114 N.M. 537, 843 P.2d 839 (Ct. App. 1992), an obscenity case that has no bearing on the facts of the case before us. Although the Guild pushes for an analysis under the New Mexico Constitution, it offers the alternative argument that the Ordinance also fails under the United States Constitution. {20} New Mexico has adopted the interstitial approach to interpreting our state constitution. See State v. Perry, 2009-NMCA-052, ¶ 24, 146 N.M. 208, 207 P.3d 1185. “A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics.” State v. Gomez, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1. “[S]tate courts should be sensitive to developments in federal law. Federal precedent in areas addressed by similar provisions in our state constitutions can be meaningful and instructive.” Id. ¶ 21 (internal quotation marks and citation omitted). We find none of those three situations to apply in the case before us. Further, we have previously held that “the protection of the federal and state constitutions are the same, at least with respect to content-neutral restrictions.” State v. Ongley, 118 N.M. 431, 432, 882 P.2d 22, 23 (Ct. App. 1994), modified on other grounds by Gomez, 1997-NMSC-006; see State v. Rendleman, 2003-NMCA-150, ¶ 58, 134 N.M. 744, 82 P.3d 554, overruled on other grounds by State v. Myers, 2009-NMSC-016, 146 N.M. 128, 207 P.3d 1105. Thus, we see no reason to depart from traditional federal jurisprudence in this area, and we proceed with a standard First Amendment analysis. 2. Facial vs. As-Applied Challenges {21} As a threshold matter, we note that the parties spar over the distinction between facial and as-applied challenges and its application to the case before us. While we disagree with the Guild’s assertion that the district court refused to conduct an as-applied analysis, we do note that the district court at times may have overemphasized the significance of the Guild’s choice to not press a facial challenge in this case when analyzing the distinction between facial and as-applied challenges. The Guild has stipulated that it did not bring a facial challenge; it did not stipulate to the facial validity of the Ordinance in all its applications. {22} While the Guild’s choice to forgo a facial challenge to the Ordinance weakens the Guild’s arguments overall, that choice does not render its action null and void, nor does it obviate the need for a full analysis of the time-place-manner zoning, which we flesh out in the section that follows. The United States Supreme Court has stated that the distinction between facial and as-applied challenges “goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.” Citizens United v. Fed. Election Comm’n, __ U.S. __, __, 130 S. Ct. 876, 893 (2010). {23} Finally, we resist any temptation to take it upon ourselves to expand the scope of our review to analyze the constitutionality of the Ordinance in its entirety under the theory of overbreadth. The overbreadth doctrine is “strong medicine” to be applied “sparingly and only as a last resort.” Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973), superseded by statute on other grounds as stated in Bauers v. Cornett, 865 F.2d 1517 (8th Cir. 1989). The United States Supreme Court has further reasoned: “It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily — that is, before it is determined that the statute would be valid as applied.” Bd. of Tr. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 484-85 (1989). “Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiffs own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws.” Id. at 485. We thus proceed to conduct a time-place-manner analysis of the constitutionality of the Ordinance as applied to the Guild. 3. Time-Place-Manner Zoning {24} Our First Amendment analysis recognizes the bedrock principle of the right to free speech articulated by the framers of both the state and federal constitutions. ‘“At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.’” United States v. Strandlof 667 F.3d 1146, 1156-57 (10th Cir. 2012) (quoting Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988)). “[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Ashcroft v. A.C.L.U., 535 U.S. 564, 573 (2002) (alteration, internal quotation marks, and citation omitted). “However, this principle, like other First Amendment principles, is not absolute.” Ashcroft, 535 U.S. at 573. We have long held that First Amendment rights “are not immune from governmental regulation” and a city “may impose reasonable restrictions on the time, place, and manner in which such rights are exercised.” City of Las Cruces v. Huerta, 102 N.M. 182, 186, 692 P.2d 1331, 1335 (Ct. App. 1984) (internal quotation marks and citation omitted). The zoning power of local governments, which allows limited restrictions on First Amendment freedoms, “is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities.” Schad v. Borough of Mount Ephraim, 452 U.S. 61, 68 (1981). The United States Supreme Court, however, has cautioned, such zoning power “is not infinite and unchallengeable].]” Id. {25} The rationale for allowing zoning regulations in this context is that a “city’s interest in attempting to preserve the quality of urban life is one that must be accorded high respect.” Young, 427 U.S. at 71. In Young, the Supreme Court upheld a Detroit zoning ordinance that prohibited adult amusement establishments, including movie theaters, from locating within 1,000 feet of one another. See id. at 52, 72-73. The plurality opinion and concurrence agreed that such a regulation of adult theaters was not an impermissible restriction ofFirst Amendment rights, because it was targeted not at the content of the speech involved but at the negative secondary effects caused by adult entertainment. See id. at 71 n.34, 78-79 (Powell, J., concurring). The Court found no restriction on the amount of speech allowed; merely that the speech was limited to certain areas. See id. at 51. Ten years later, the Court upheld an ordinance prohibiting adult amusement establishments from locating within 1,000 feet of residential areas, churches, parks, and schools. See Renton, 475 U.S. at 43, 52. The Court found that the ordinance left five percent of the city’s land available for use by adult establishments, an amount deemed adequate to show that the city was not targeting the content of the speech. See id. at 53-54. {26} Young and Renton thus permit municipalities to use zoning powers to reduce or eliminate the negative secondary effects of adult entertainment by either scattering such establishments or concentrating them in circumscribed zones with similar activities. See City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 434 (2002); Renton, 475 U.S. at 52; Young, 427 U.S. at 72-73. Such zoning ordinances are subject to intermediate scrutiny. See Alameda Books, Inc., 535 U.S. at 434. {27} While the Supreme Court has never veered from that line of case law, it has struggled with the “fiction” of using the term “content neutral” to cover zoning laws that clearly apply only to adult material. Alameda Books, Inc., 535 U.S. at 448 (Kennedy, J., concurring). However, the Court has endorsed the zoning power over adult amusement establishments under the idea that cities are not regulating the content of the entertainment provided by these businesses but rather the negative secondary effects that such adult material produces in the surrounding community, such as crime and sex offenses. See id. at 434; Renton, 475 U.S. at 48; Young, 427 U.S. at 54-55. Such regulations are contrasted with those that impermissibly target the direct effects of the speech on the listener or viewer. “Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners’ reactions to speech are not the type of ‘secondary effects’ we referred to in Renton.” Boos v. Barry, 485 U.S. 312, 321 (1988). For instance, if the City had enacted the Ordinance based on fears of the psychological impact that adult films have on viewers, then the regulation would not be content-neutral, and thus would be subject to the highest level of scrutiny under First Amendment analysis. See Boos, 485 U.S. at 321. We must be careful to focus our “principal inquiry” on determining “whether the government has adopted a regulation of speech because of disagreement with the message it conveys.” Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). “Thus, the Court has recognized that this kind of regulation, though called content neutral, occupies a kind of limbo between full-blown, content-based restrictions and regulations that apply without any reference to the substance of what is said.” Alameda Books, Inc., 535 U.S. at 457 (Souter, J., dissenting). a. Strict Scrutiny vs. Intermediate Scrutiny {28} As a preliminary matter, the Guild seeks to exploit that subtle fissure between content-based and content-neutral regulations in the realm of adult entertainment. It argues that the City must be targeting the content of the film, because the City could not possibly find it necessary to police the negligible or nonexistent secondary effects from the showing of only one film. The Guild spends a good part of its brief in chief urging application of the highest standard of review in this case: strict scrutiny. We reject that argument. {29} “Strict scrutiny applies when the violated interest is a fundamental personal right or civil liberty guaranteed by the constitution.” ACLU of N.M. v. City of Albuquerque, 2006-NMCA-078, ¶ 19, 139 N.M. 761, 137 P.3d 1215 (internal quotation marks and citation omitted). Under that heightened review of a legislative action, the burden of proof is on the government to show that it has a compelling interest in the challenged scheme and that it has accomplished its goals by employing the least restrictive means. See id. If the City were targeting content of adult films with the Ordinance, strict scrutiny would apply; if it were merely seeking to combat negative secondary effects of such films, then we would apply a more relaxed level of scrutiny (discussed in the next section below). See Alameda Books, Inc., 535 U.S. at 448 (Kennedy, J., concurring). The Guild argues that the City improperly targeted the content of its expression rather than the negative secondary effects, but the Guild misapplies case law in order to make its point. The Guild claims that the task of this Court is to examine whether either negative secondary effects or the content of the movie were the predominant concern behind application of the Ordinance. On the contrary, the cases cited by the Guild state that a court must examine whether secondary effects or content were the predominant concern behind the enactment of an ordinance — not its subsequent application. See R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 409 (7th Cir. 2004) (stating that “we must examine whether the [ordinance was designed to suppress the content of erotic expression or to address the negative secondary effects caused by such expression” (emphasis added)); Joelner v. Vill. of Washington Park, Ill., 378 F.3d 613, 623 (7th Cir. 2004) (“The ‘content-neutrality’ inquiry is therefore subsumed by the inquiry into a municipality’s purpose in enacting the regulation.”). The rest of the Guild’s strict-scrutiny argument proceeds from that faulty premise. {30} Here, without a full trial below on the issues, there is no evidence that the City was targeting the content of adult films in enacting the Ordinance; in fact, the City asserts that its predominant concern in enacting the Ordinance was combating the secondary effects of such films. The Guild does not rebut that contention. Absent evidence that the City was going after content when enacting the Ordinance, we refrain from analyzing its actions under the strict scrutiny that would favor the Guild. See BBI Enters., Inc. v. City of Chicago, 874 F. Supp. 890, 895 (N.D. Ill. 1995) (“There is no need to elaborate further on the deficiencies in either party’s proof, for where as here neither side has supplied entirely reliable information, the party having the burden of persuasion . . . must suffer the consequences of such uncertainty.”). W e thus proceed with the intermediate level of time-place-manner scrutiny. b. Time-Place-Manner Analysis {31} The United States Supreme Court starts the analysis of time-place-manner regulations by asking two threshold questions: (1) Does the ordinance ban adult establishments altogether, and (2) does the regulation target the content of the expression? See Alameda Books, Inc., 535 U.S. at 434. If the answer to each question is “no,” then the ordinance can be analyzed under time-place-manner regulation. See id. The New Mexico Supreme Court has outlined three requirements for valid time-place-manner zoning: (1) the restriction on speech must be content neutral, that is, “justified without reference to the content of the regulated speech”; (2) the restriction must serve a “significant governmental interest”; and (3) the restriction must “leave open ample alternative channels for communication of the information.” Stuckey’s Stores, Inc. v. O’Cheskey, 93 N.M. 312, 319, 600 P.2d 258, 265 (1979) (internal quotation marks and citation omitted). The United States Supreme Court expands on the second prong by requiring that the ordinance in question be “narrowly tailored” to serve that significant governmental interest. Renton, 475 U.S. at 52, 63 (citation omitted). {32} The appropriate standard for “reviewing challenges to content-neutral zoning ordinances targeting the secondary effects of adult establishments” applies “regardless of whether that challenge is styled as facial or as-applied.” Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 155 n.3 (4th Cir. 2009). Lower courts have faithfully applied the analysis during the past quarter century: “Renton’s constitutional framework grants the city broad discretion to choose the means and scope of its regulation of sexually oriented businesses.” Z.J. Gifts D-2, L.L.C. v. City of Aurora, 136 F.3d 683, 689 (10th Cir. 1998). I. Content Neutral {33} We first dispose of the two threshold questions. First, the City has not entirely banned adult amusement establishments from operating in the City, either directly or indirectly. Cf. Schad, 452 U.S. at 76 (“As we have observed, Young . . . did not purport to approve the total exclusion from the city of theaters showing adult. . . materials.”). The City, in an unrebutted assertion, states that about five percent of the municipality’s acreage is zoned to allow the exhibition of adult films. That level of set-aside comports with the amount of land mass deemed reasonable by the Court in Renton. See 475 U.S. at 53. Second, the Guild does not challenge the City’s assertion that, in enacting the Ordinance, the City was not regulating content but rather the secondary effects that flow from the showing of adult films. The Guild also concedes that the City has that zoning authority under its powers to regulate the time, place, and manner of the entertainment offered by adult amusement establishments. {34} It is when we get to the time-place-manner analysis that the Guild challenges the City’s actions. The Guild contends that, as applied in this case, the City fails the two prongs of the Renton test: that the Ordinance is not narrowly tailored to serve a significant governmental interest and that it does not leave the Guild with adequate alternative channels of communication. ii. Narrowly Tailored to Serve a Significant Governmental Interest {35} An ordinance qualifies as narrowly tailored “so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest. If these standards are met, courts should defer to the government’s reasonable determination.” Ward, 491 U.S. at 782-83. “The government’s purpose is the controlling consideration.” Id. at 791. While the regulation must be narrowly tailored, “it need not be the least restrictive or least intrusive means of doing so.” Id. at 798; see Fox, 492 U.S. at 477 (“We have refrained from imposing a least-restrictive-means requirement — even where core political speech is at issue — in assessing the validity of so-called time, place, and manner restrictions.”). {36} The City asserted that its goal in enacting the Ordinance was to combat the negative secondary effects produced by adult theaters in general, and the Guild offers no rebuttal. The stated purpose of the City’s zoning regulations is “to create orderly, harmonious, and economically sound development in order to promote the health, safety, convenience, and general welfare of the citizens of the city.” Albuquerque, N.M., Rev. Ordinances § 14-16-1-3(A). The City asserts, without challenge by the Guild, that the drafters of the Ordinance relied on “numerous studies and other evidence” concerning the adverse secondary effects emanating from adult amusement establishments. Because the Guild does not rebut that assertion, we defer to the City’s presumptively reasonable determination in the name of public health, safety and welfare. The municipality’s evidence must fairly support the municipality’s rationale for its [adult amusement] ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality’s evidence does not support its rationale or by furnishing evidence that disputes the municipality’s factual findings, the municipality meets its burden. 6A Eugene McQuillin, The Law of Municipal Corporations § 24:128, at 472 (3d ed. 2007) (footnote omitted). {37} It is well-established New Mexico law that “[t]o be within the authorized purposes the zoning ordinance must bear some reasonable relationship to the general welfare.” City of Santa Fe v. Gamble-Skogmo, Inc., 73 N.M. 410, 413, 389 P.2d 13, 15 (1964). In the case before us, no evidentiary hearing was conducted to flesh out the details of the City’s reasons for legislating against the negative secondary effects of adult entertainment. Specifically, we have no way of divining whether the “numerous studies and other evidence” relied on by the City in any way address the negative secondary effects of the screening of adult films on a rare or occasional basis. {38} When similar regulations fail, a municipality tramples on protected speech and ignores ample alternative means of combating secondary effects. In a recent case, Ascherl v. City oflssaquah, No. C11-1298MJP, 2011 WL 4404145, at *2-3 (W.D. Wash. 2011), a municipality sought to limit the distribution of leaflets to a “free[-]speech zone” in order to “serve public safety concerns, minimize congestion, and facilitate the orderly flow of pedestrian traffic” during an annual festival. The court found the ordinance inadequately tailored and ruled in favor of a pamphleteer who ventured outside the zone, because the court found “no evidence that leafleting by itself causes congestion or prohibits the orderly flow of pedestrian traffic, let alone creates a public safety concern.” Id. at *3. In contrast, the respondent was found to have properly tailored its adult entertainment ordinance by showing its “great interest in protecting and preserving the quality of its neighborhoods through effective land-use planning” and its “sincere and sustained effort to enhance and improve the quality of life in Seattle.” Northend Cinema, Inc. v. City of Seattle, 585 P.2d 1153, 1158-59 (Wash. 1978) (en banc). The Washington Supreme Court said of the ordinance that is similar to the one before us and the Court in Young'. “It demonstrates a reasonable decision that the public welfare is best served by having this particular type of speech take place only in certain areas of the community. The ordinance thus remains neutral regarding the content of the films[.]” Northend Cinema, Inc., 585 P.2d at 1158. The court concluded that the ordinance was not “a disguised form of censorship.” Id. at 1159. {39} Absent evidence to the contrary, we take the City at its word that the Ordinance was designed to promote its significant interest of combating the negative secondary effects of adult entertainment. And we believe that the City, like Seattle in Northend Cinema, Inc. and like numerous other towns in the wake of Young, took a reasonable route in accomplishing its goal. To that end, we refuse to place ourselves in the position of legislators acting on behalf of the health, safety, and welfare of the public. See Ward, 491 U.S. at 800 (stating that the validity of time-place-manner regulations “does not turn on a judge’s agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted” (internal quotation marks and citation omitted)). {40} As noted above, the Guild directs our attention from the enactment of the Ordinance and focuses on its application. It attacks the City on the grounds that, in this instance, the showing of one adult film produced no negative secondary effects. Although the Guild does not rebut the City’s assertion that the Ordinance was enacted to combat the negative secondary effects associated with the exhibition of adult films, it asserts that the City failed to produce evidence of negative secondary effects resulting from the Guild’s single showing of the adult film in this instance. The Guild’s argument fails, because it is well-established that cities, in enforcing a time-place-manner restriction, need not prove the existence of negative secondary effects in each instance: “[T]hat fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government’s interests in an individual case.” Id. at 801; see Independence News, Inc., 568 F.3d at 156 (stating that a city “does not have to show that a particular adult establishment generates adverse secondary effects each time it seeks to enforce” such a zoning ordinance); BZAPS, Inc. v. City of Mankato, 268 F.3d 603, 607 (8th Cir. 2001) (“[A] city would have the burden of showing precisely how many adult performances were capable of producing an unacceptable level of antisocial activity before the city could regulate those performances. We are satisfied that neither the [F]irst [AJmendment nor Supreme Court precedent requires a city to do the impossible.”); City of Columbia v. Pic-A-Flick Video, Inc., 531 S.E.2d 518, 521 (S.C. 2000) (“Municipalities do not have to show negative secondary effects in order to enforce adult zoning provisions.”); BBI Enters., Inc., 874 F. Supp. at 891 n.4 (stating that “once an ordinance is rendered facially valid by legitimate legislative findings as to the general problem to be dealt with, a specific operation does not necessarily escape the [ojrdinance’s provisions by showing that those genericallyfjvalidating characteristics do not in fact apply to that operation”). {41} We conclude that the Ordinance serves a significant governmental interest and is narrowly tailored to achieve that interest. iii. Leaves Open Alternative Channels for Communication {42} The Guild makes a brief argument and cites to only one out-of-state federal district court case that is not on point for the proposition that the Ordinance does not provide it with “practical alternative avenues for showing an occasional adult film.” It may be true that the Guild’s regular customers prefer not to frequent an adult cinema, and it may be inconvenient for the Guild to rent out such a cinema in another part of town properly zoned for such an exhibition. But just recognizing such an option acknowledges that at least one alternative exists for the Guild to present adult films in Albuquerque, and it is not an entirely unreasonable one. Zoning laws inevitably create hurdles for various behavior and forms of expression in certain parts of town; there is no evidence to suggest that this one rises to the level of an unconstitutional burden on the Guild’s free-speech rights. As the Washington Supreme Court stated: “[Ajlthough potential viewers would be able to see the films only in those downtown areas, there is no evidence that this places any burden on the adult movie market.” Northend Cinema, Inc., 585 P.2d at 1158. In the case before us, the Guild has produced no evidence that it was left with no reasonable alternative channels of communication. We thus conclude that the Ordinance is a constitutionally valid regulation of the time, place, and manner of the exhibition of adult films as applied to the facts of this case. III. CONCLUSION {43} We are aware of the problems of line-drawing that this case represents. The Ordinance does not provide a threshold level of adult film screenings that would be tolerated outside the permissible zones. The City voices a concern about the potential cumulative effect of allowing even occasional showings of adult films in areas not zoned for such behavior. Cf. F. C. C. v. Fox Television Stations, Inc., 556 U.S. 502, 521 (2009) (supporting a federal agency’s enforcement action against isolated uses of profanity on television and stating that “[t]o predict that complete immunity for fleeting expletives ... will lead to a substantial increase in fleeting expletives seems to us an exercise in logic”). We recognize that the Ordinance affects First Amendment rights. We also recognize that the Guild’s position is that the Ordinance regulating adult amusement establishments is overbroad and reaches some speech that does not create the type of secondary effects it seeks to protect against. This case, however, does not present us with that question, and the record before us does not provide the proper basis on which to declare that the City may not prosecute mainstream movie theaters that occasionally exhibit pornographic films. {44} As discussed above, we generally defer to the zoning power of municipalities, even though it is inevitable that the lines drawn pursuant to that power will result in winners and losers. “[E]very line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function.” Vill. of Belle Terre v. Boraas, 416 U.S. 1, 8 (1974) (footnote omitted). We applaud the wisdom of Justice Oliver Wendell Holmes: When a legal distinction is determined ... a point has to be fixed or a line has to be drawn ... to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. . . . But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the [legislature must be accepted unless we can say that it is very wide of any reasonable mark. Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting). {45} Based on the record before us, we cannot say here that the Ordinance missed the mark in confining the exhibition of adult films to specified zones within the City limits. The enforcement of the Ordinance — even against a mainstream theater screening one adult film — was not unconstitutionally applied in this case. For the foregoing reasons, we affirm the decision of the district court. {46} IT IS SO ORDERED. CELIA FOY CASTILLO, Chief Judge I CONCUR: MICHAEL E. VIGIL, Judge JONATHAN B. SUTIN, Judge, dissenting