## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2013-NMSC-044

Filing Date:  September 12, 2013

Docket No. 33,693

STATE OF NEW MEXICO,
CITY OF ALBUQUERQUE,

Plaintiffs-Respondents,

v.

PANGAEA CINEMA LLC d/b/a
GUILD CINEMA LLC, KEIF
HENLEY, registered agent,

Defendants-Petitioners.

ORIGINAL PROCEEDING ON CERTIORARI
Carl J. Butkus, District Judge

ACLU of New Mexico
Laura Louise Schauer Ives
Albuquerque, NM

Morrissey Lewis L.L.C.
Kari T. Morrissey
Albuquerque, NM

for Petitioners

John E. Dubois, Assistant City Attorney
Albuquerque, NM

for Respondents

## OPINION

**CHÁVEZ, Justice.**

**{1}**     On a November weekend in 2008, an art-house movie theater in Albuquerque's Nob

Hill neighborhood hosted a film festival. The Nob Hill Business Association described the event as "a success, not only in driving [customer] traffic to the area, but also in the quality and caliber of those customers." The Association specifically noted that there were "almost no negative comments" and that it hoped the film festival would continue to present the festival. Several local business owners stated that the festival had positive effects on the neighborhood, including increased sales and broader public awareness of the businesses in the area. The festival did not cause any crime or other negative effects in the neighborhood.

{2} The festival was titled "Pornotopia," and it featured at least one erotic or pornographic film. Other than the weekend of Pornotopia, the theater showed non-pornographic films. Despite Pornotopia's positive impact on the neighborhood and the generally non-adult nature of the hosting theater, the theater was convicted of a zoning violation for operating an "Adult Amusement Establishment" in an improper zone. *See* Albuquerque, N.M., Code of Ordinances, § 14-16-1-5(B) (1974, amended 2012) (defining "adult amusement establishment"). The theater argues before this Court that the conviction violated its state and federal constitutional rights to free speech.

{3} An "adult amusement establishment" is defined in the Albuquerque Code of Ordinances as "[a]n establishment such as [a] . . . theater . . . that provides amusement or entertainment featuring . . . films, motion pictures . . . or other visual representations or recordings characterized or distinguished by an emphasis on . . . specified anatomical areas or . . . specified sexual activities." *Id.* Consistent with our responsibility to interpret ordinances to avoid constitutional concerns, we interpret the term "adult amusement establishment" to apply only to traditionally adult businesses. Because this category does not include theaters that rarely or only occasionally feature adult entertainment, the theater in this case was not an adult amusement establishment, and it did not commit a zoning violation. Therefore, we do not reach the constitutional questions raised by the theater.

**BACKGROUND**

{4} Defendant Pangaea Cinema ("the Guild") is a limited liability company that does business as the Guild Cinema in the Nob Hill area of Albuquerque. The Guild is an art-house theater that usually shows non-pornographic independent films. However, on the weekend of November 14-16, 2008, the Guild hosted an erotic film festival called "Pornotopia." This was the second time that the Guild had presented Pornotopia, and the festival was apparently intended to be an annual event.

{5} The Guild is located in an area of Albuquerque that is zoned C-2, or "Community Commercial." Albuquerque does not permit adult amusement establishments in C-2 zones. *See* Albuquerque, N.M., Code of Ordinances, § 14-16-2-17(A) & (B) (1974, amended 2012) (not listing adult amusement establishments as either permissive or conditional use in C-2 zones); Albuquerque, N.M., Code of Ordinances, § 14-16-1-3(B) (1974, amended 1980) ("Any use not designated a permissive or conditional use in a zone is specifically prohibited from that zone, except as otherwise provided herein."). The City defines an "adult

amusement establishment" as

> An establishment such as an auditorium, bar, cabaret, concert hall, nightclub, restaurant, theater, or other commercial establishment that provides amusement or entertainment featuring one or more of the following:
>
> (1)     A live performance, act or escort service distinguished or characterized by an emphasis on the depiction, description, exposure, or representation of specified anatomical areas or the conduct or simulation of specified sexual activities; or
>
> (2)     Audio or video displays, computer displays, films, motion pictures, slides or other visual representations or recordings characterized or distinguished by an emphasis on the depiction, description, exposure or representation of specified anatomical areas or the conduct or simulation of specified sexual activities.

Section 14-16-1-5(B).

**{6}**     The City of Albuquerque apparently became concerned that the Guild's screening of the films in Pornotopia might constitute a zoning violation. Two zoning enforcement inspectors visited the festival and watched a film entitled "Couch Surfers, Trans Men in Action." The parties agree that the film was characterized or distinguished by an "emphasis on . . . specified anatomical areas or . . . specified sexual activities" as described in Section 14-16-1-5(B). On the basis of this screening, the City determined that the Guild was operating as an adult amusement establishment in an area that was not zoned for adult entertainment.

**{7}**     In December 2008, the State of New Mexico and the City of Albuquerque charged the Guild with a criminal zoning violation in metropolitan court. (For clarity, we refer to the prosecuting body either as "Albuquerque" or "the City.") The metropolitan court found the Guild guilty, and the Guild appealed to the Second Judicial District Court. The district court held that the Guild had committed a zoning violation and that the zoning ordinances were constitutional as they applied to the Guild. The district court also imposed a criminal fine of $500. The Court of Appeals affirmed the Guild's conviction. *City of Albuquerque v. Pangaea Cinema LLC*, 2012-NMCA-075, ¶ 1, 284 P.3d 1090, *cert. granted*, 2012-NMCERT-007.

**DISCUSSION**

**{8}**     The parties agree on the salient facts of the case, and our role is to interpret the

3

Albuquerque ordinance at issue.[1]  "Interpretation of municipal ordinances and statutes is a question of law that we review de novo."  *Stennis v. City of Santa Fe*, 2008-NMSC-008, ¶ 13, 143 N.M. 320, 176 P.3d 309.  The Guild has also made constitutional arguments, and to the extent that we address these arguments, we consider them de novo.  *State v. DeGraff*, 2006-NMSC-011, ¶ 6, 139 N.M. 211, 131 P.3d 61.

**{9}**  Cities are generally allowed to impose different zoning requirements on adult theaters than on mainstream theaters.[2]  *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71-73 (1976) (plurality opinion); *id.* at 74 (Powell, J., concurring in the judgment and portions of the opinion).  Even though such zoning ordinances categorize theaters based on the content they exhibit, courts may analyze the ordinances as content-neutral time, place, and manner restrictions.  *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986).  The idea is that these zoning restrictions target not the content of the films shown, but rather the "*secondary effects*" caused by the accumulation of adult amusement establishments in a city.  *Id.*

**{10}**  Secondary effects were described by the *Young* and *Renton* courts.  In *Young*, the City of Detroit adopted an ordinance stating that a concentration of adult businesses "tends to attract an undesirable quantity and quality of transients, adversely affects property values, causes an increase in crime, especially prostitution, and encourages residents and businesses to move elsewhere."  427 U.S. at 55.  In *Renton*, a similar ordinance was "designed to prevent crime, protect the city's retail trade, maintain property values, and generally protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life, not to suppress the expression of unpopular views."  475 U.S. at 48 (alterations in original) (internal quotation marks and citation omitted).

**{11}**  Because these ordinances are treated as time, place, and manner restrictions, *id.* at 47, they are valid if (1) they are content-neutral, (2) "they are narrowly tailored to serve a significant governmental interest," and (3) "they leave open ample alternative channels for communication of the information."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  Cities carry a light evidentiary burden in justifying these ordinances, and

---

[1]We briefly note the City's argument that the parties' "stipulations . . . preclude the necessity of statutory interpretation."  This is extremely unusual, as the parties did not stipulate to the meaning of the ordinance.  Even if they had done so, we would retain an independent responsibility to interpret the ordinance.  "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

[2]Laurence Tribe has dubbed this practice "erogenous zoning."  Laurence H. Tribe, American Constitutional Law 934 (2d ed. 1988); *see also* Kathleen M. Sullivan, *Sex, Money, and Groups:  Free Speech and Association Decisions in the October 1999 Term*, 28 Pepp. L. Rev. 723, 727 n.38 (2001) (crediting Tribe with coining the term).

they have some flexibility in designing them. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 451 (2002) (Kennedy, J., concurring in the judgment) ("[W]e have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required."). Cities may choose to disperse their adult businesses or concentrate them. *Renton*, 475 U.S. at 52. They may rely on studies from other cities rather than producing their own evidence, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51-52.

**{12}** It is not clear precisely which secondary effects Albuquerque fears will result from the presence of adult amusement establishments; the ordinance does not include legislative findings, and the City's briefing did not specify the evidence on which the Albuquerque City Council relied in enacting the ordinance. Nevertheless, the Albuquerque ordinance in question is similar to the ordinances upheld in other cases, including *Young* and *Renton*, and the Guild does not challenge its constitutionality except as it is applied in this case.

**{13}** There is no dispute that "Couch Surfers" was an adult "amusement or entertainment" film under the terms of Section 14-16-1-5(B). However, this is a zoning case, and the central question is not whether the film was classified as adult amusement, but whether the theater was an adult amusement establishment within the meaning of the ordinance.

**{14}** The parties agree that the Guild theater shows adult films only rarely, at most one weekend per year. Consistent with that reality, the Guild is an ordinary-looking art-house theater. It has none of the trappings of an adult theater; there are no neon signs proclaiming "Girls! Girls! Girls!" or "XXX." Nothing about the Guild appears to be seedy, unsavory, or likely to drive down property values. It is undisputed that Pornotopia did not, in fact, result in any negative secondary effects in the Nob Hill neighborhood. In short, while the City of Albuquerque may believe that adult theaters cause negative secondary effects, the Guild is not an adult theater either in function or appearance.

**{15}** Our role in interpreting an ordinance is to look for the intent of the legislative body. *See New Mexicans for Free Enter. v. The City of Santa Fe*, 2006-NMCA-007, ¶ 59, 138 N.M. 785, 126 P.3d 1149 ("We construe an ordinance as we would a statute, giving effect to the intent and purpose of those who enacted it . . . ."). Presumably, the intent of the Albuquerque City Council was to avoid or quarantine the negative secondary effects of adult amusement businesses. The ordinance contains no indication that it should apply to venues that only occasionally show adult films. To the contrary, the nature of zoning ordinances suggests that the restrictions on adult entertainment establishments were intended to regulate businesses of a clearly adult nature. "Zoning rules generally only apply to the regular use of a building," not occasional deviations from those uses. *Schmitty's City Nightmare, LLC v. City of Fond du Lac*, 391 F. Supp. 2d 745, 756 (E.D. Wis. 2005) ("[A] residential house, for example, does not become zoned as a commercial hotel by virtue of having the occasional overnight guest.").

**{16}** In addition, we consider the ordinary meaning of the terms used in the ordinance.

5

*See Whitely v. New Mexico State Pers. Bd.*, 1993-NMSC-019, ¶ 5, 115 N.M. 308, 850 P.2d 1011 ("The words of a statute . . . should be given their ordinary meaning absent clear and express legislative intention to the contrary."). The Guild is simply not an adult amusement establishment in the ordinary meaning of the term. If we were to stand on Central Avenue and ask pedestrians for directions to the nearest adult theater, it is unlikely that they would direct us to the Guild. By the same token, without some clearer indication of legislative intent, we cannot simply assume that the Albuquerque City Council meant to designate the Guild as an "adult amusement establishment" because it showed adult films during one weekend.

**{17}**     Following the City's suggested interpretation would lead to absurd results. *See State v. Padilla*, 1997-NMSC-022, ¶ 6, 123 N.M. 216, 937 P.2d 492 ("We read statutes to avoid absurd or unreasonable results." (internal quotation marks and citations omitted)). For example, a professor at the University of New Mexico might screen a pornographic film during a course on human sexuality or the like; we cannot imagine that the screening would render the lecture hall an "adult amusement establishment." In the words of the federal district court for the Eastern District of Wisconsin,

> One would not call a bar a "martini bar" if it served martinis only once a year, just as one would not call a club a "jazz club" if 99% of its music was rock and roll. Suffice it to say that in the English language, when an adjective, such as "adult" (as used here), modifies a noun that is a physical location (a structure or building which features topless dancers, strippers, male or female impersonators, or similar entertainers), we assume that the adjective has temporal permanence just as the physical structure does.

*Schmitty's*, 391 F. Supp. 2d at 757. The Albuquerque city ordinance does not specify exactly how many pornographic films a theater must show to qualify it as an adult amusement establishment, and we do not need to set such a standard now. We can say with confidence, however, that the ordinance does not reach the type of very occasional showing at issue in this case. One weekend of erotic films per year does not an adult theater make.

**{18}**     There is another reason to follow this interpretation of the statute. "[W]e seek to avoid an interpretation of a statute that would raise constitutional concerns." *Chatterjee v. King*, 2012-NMSC-019, ¶ 18, 280 P.3d 283. The Guild has raised significant questions about the constitutionality of a city ordinance broad enough to treat the Guild as an adult amusement business. The United States Supreme Court has rejected constitutional challenges to "erogenous zoning" ordinances, but the businesses at issue in those cases were unambiguous, full-time adult amusement establishments. *See Alameda Books*, 535 U.S. at 432 (plurality opinion) (respondents rented and sold "sexually oriented products" and provided viewing booths); *Renton*, 475 U.S. at 45 (theater intended to "exhibit feature-length adult films"); *Young*, 427 U.S. at 59 n.16 ("Neither respondent has indicated any plan to exhibit pictures even arguably outside the coverage of the ordinances."). The United States Supreme Court has never considered the constitutionality of adult amusement ordinances as

they are applied to mainstream or art-house theaters that occasionally show adult films.

{19}    However, several lower courts have concluded that it is unconstitutional to place zoning restrictions on businesses that occasionally feature adult entertainment. In *Tollis, Inc. v. San Bernardino County*, 827 F.2d 1329, 1331, 1333 (9th Cir. 1987), *modification on other grounds recognized by Alameda Books, Inc. v. City of Los Angeles*, 222 F.3d 719, 722-23 (9th Cir. 2000), *reversed on other grounds by Alameda Books*, 535 U.S. at 429 (plurality opinion), 444 (Kennedy, J., concurring in the judgment), the Court of Appeals for the Ninth Circuit affirmed a permanent injunction enjoining enforcement of the county's adult amusement business zoning ordinance. The San Bernardino County ordinance, like the one at issue in this case, "failed to define the extent of use for showing adult films that would be necessary to render a theater an 'adult business.'" *Id.* at 1331. The county construed the ordinance to reach any business that engaged in a single showing of an adult film. *Id.* The Ninth Circuit held that the ordinance, as construed by the county, failed the narrow tailoring prong of the *Renton* time, place, and manner analysis. *Id.* at 1333. It observed that "the County . . . presented no evidence that a single showing of an adult movie would have any harmful secondary effects on the community," and added that it did not "see how the County could make such a showing, since it is difficult to imagine that only a single showing ever, or only one in a year, would have any meaningful secondary effects." *Id.*

{20}    Relying on *Tollis*, the California Supreme Court held that it would be unconstitutional for the City of Long Beach to classify a theater as an adult establishment based on a single showing of an adult film. *People v. Superior Court* (*Lucero*), 774 P.2d 769, 775 (Cal. 1989). The California court noted that the Long Beach ordinance had made no findings or claims about "significant deleterious effects on the community arising out of a single showing of an adult film." *Id.*

{21}    Courts have expressed the concern that when municipalities include ordinary, generally non-adult amusement businesses in the sweep of their "erogenous zoning" ordinances, they risk losing their focus on secondary effects, and may instead unconstitutionally target the content of the adult entertainment. For example, in *Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 796 (6th Cir. 2004), the Court of Appeals for the Sixth Circuit held that an ordinance was not narrowly tailored because it included bookstores that had a "'segment or section'" devoted to adult material. The court expressed concern that the ordinance could encompass "multiple establishments which would never be defined as adult bookstores in everyday English," even though the city had produced no evidence that adult sections in ordinary bookstores could produce negative secondary effects. *Id.* The court concluded that an "ordinance is simply not narrowly tailored when its language sweeps up mainstream bookstores, as it is then evident that the ordinance is controlling the dissemination of objectionable reading material rather than the effects upon a neighborhood from the businesses that disseminate and specialize in such material." *Id.* at 796-97.

{22}    Similarly, in *Pensack v. City & County of Denver*, 630 F. Supp. 177, 181 (D. Colo.

7

1986), the federal district court for the District of Colorado held that a Denver ordinance denied due process to the owner of a bakery that sold both erotic and non-erotic baked goods. The City of Denver apparently applied the zoning ordinance only to stores that used at least 10% of their floor area to sell erotic items. *Id.* at 179. The court expressed concerns that even with this threshold in place, zoning authorities would have to "monitor the films in a regular theater or examine the books in an ordinary bookstore to determine the quantity of sexually specific content in all that is shown and sold." *Id.* at 181.

**{23}** Although our reading of the Albuquerque city ordinance eliminates the need for us to address the constitutional questions raised by the Guild, we are acutely aware of the constitutional backdrop to this case. Not all courts that have considered the issue agree that it is unconstitutional to zone a business as "adult" based on a single or occasional instance of adult entertainment. *See BZAPS, Inc. v. City of Mankato*, 268 F.3d 603, 607 (8th Cir. 2001) (upholding city's application of adult zoning ordinance to a single adult amusement performance). Nonetheless, enough courts have found this type of application unconstitutional that our canon of constitutional avoidance comes into play. When possible, we must construe a statute or ordinance "'so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.'" *State v. House*, 2001-NMCA-011, ¶ 41, 130 N.M. 418, 25 P.3d 257 (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)).

**{24}** The City voiced concern that if the Guild prevails, more theaters in areas that are not zoned for adult amusement establishments will "show adult entertainment on a routine but not constant basis" to avoid the bite of the zoning ordinances. If Albuquerque is concerned that mainstream theaters will start showing adult entertainment three days per week, as it claims in its brief, the City Council can amend the ordinance to set a threshold level of adult amusement material that would classify a business as an "adult amusement establishment." In the case of a movie theater, this classification could be based on the proportion of the theater's films that are pornographic, the number of such films shown per week or month, the nature of the films that receive top billing, or the percentage of revenues attributable to sexually explicit fare. As Judge Sutin noted in his dissent below, the City has already set this type of threshold in its definition of "adult store." *Pangaea*, 2012-NMCA-075, ¶ 63 (Sutin, J., dissenting) ("Section 14-16-1-5(B) . . . defines an 'adult store' as '[a]n establishment having 25% or more of its shelf space or square footage devoted to the display, rental, sale[,] or viewing of adult material for any form of consideration.'" (alterations in original)).

**{25}** However, if the City Council wishes to expand the ordinance so that rare, occasional, or incidental exhibitions of adult material will render a business an "adult amusement establishment," it must produce some evidence linking these occasional showings to negative secondary effects. *See Exec. Arts Studio*, 391 F.3d at 796 (stating that the city "cited no basis, study or third party experience that would lead one to believe that such a broad ordinance is needed to control undesirable blight" and concluding that the "ordinance [was] simply not narrowly tailored"); *Tollis*, 827 F.2d at 1333 (holding that the ordinance

was not narrowly tailored because the county "presented no evidence that a single showing of an adult movie would have any harmful secondary effects on the community"); *see also R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 411-12 (7th Cir. 2004) (holding that the city had not met even the low evidentiary burden required to support a zoning restriction because the evidence "[did] not appear to be directly relevant to the type of entertainment that Rockford [sought] to regulate").

**CONCLUSION**

**{26}**    Because the Guild engaged in only occasional showings of adult films, the Guild is not an adult amusement establishment as defined in the Albuquerque Code of Ordinances, and the zoning rules governing adult amusement establishments are inapplicable to it.  We therefore reverse the Court of Appeals and vacate the Guild's conviction.

**{27}    IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**RICHARD C. BOSSON, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

**PETRA JIMENEZ MAES, Chief Justice, dissenting**

**MAES, Chief Justice (dissenting).**

**{28}**    I respectfully dissent and adopt in full the majority opinion of the Court of Appeals, *City of Albuquerque v. Pangaea Cinema LLC*, 2012-NMCA-075, 284 P.3d 1090, as my dissent.  Like counsel for the City, I wonder why there is a need to allow the Guild to have individual showings of adult films when the City has decided to zone this activity.

**{29}**    I do not agree that "[b]ecause the Guild engaged in only *occasional* showings of adult films," that it is not considered an adult amusement establishment, and therefore the zoning ordinances governing such establishments are inapplicable to it.  Majority Opinion, ¶ 26 (emphasis added).  This language appears to broaden the discretion of theaters, auditoriums, bars, restaurants, and other commercial establishments to feature, present, and

promote one or more of the activities defined as "adult amusement" pursuant to Albuquerque, N.M., Code of Ordinances, Section 14-16-1-5(B) (1974, as amended 2012), on an undefined basis. This erodes the zoning power of municipalities and creates ambiguity in the application of a clear-cut zoning ordinance. As the Court of Appeals acknowledged, "we generally defer to the zoning power of municipalities, even though it is inevitable that the lines drawn pursuant to that power will result in winners and losers." *Pangaea Cinema LLC*, 2012-NMCA-075, ¶ 44.

_____
**PETRA JIMENEZ MAES, Chief Justice**

**Topic Index for** *State v. Pangaea Cinema, L.L.C.*, **No. 33,693**

**CONSTITUTIONAL LAW**
Freedom of Speech

**GOVERNMENT**
Municipalities
Ordinances
Zoning

**STATUTES**
Interpretation
Legislative Intent